## A05A1293. COLEMAN v. DAIMLERCHRYSLER SERVICES OF NORTH AMERICA, LLC.

(623 SE2d 189)

ADAMS, Judge.

Vada Coleman appeals from the trial court's grant of summary judgment to DaimlerChrysler Services of North America, LLC, in a suit filed after Coleman defaulted on an automobile lease agreement she signed with the company. Coleman contends that the trial court erred in granting summary judgment to DaimlerChrysler because material issues of fact remain as to whether the company's sale of the leased vehicle was commercially reasonable as required by Article 9 of the Uniform Commercial Code for secured transactions.[1] For the reasons stated below, we vacate and remand this matter for further consideration by the trial court in accordance with this opinion.

On January 4, 2002, Coleman entered into a 48-month lease agreement for a 2001 Jeep Grand Cherokee with DaimlerChrysler. At the time this lease was signed, Coleman made a "capitalized cost reduction" payment of $1,176.01 in the form of a net trade-in allowance. Under the agreement, Coleman was responsible for insurance, repairs, maintenance, taxes and operating expenses for the vehicle during the lease term, but title to the vehicle at all times remained with DaimlerChrysler. Coleman was required to return the car at the end of the term, unless she chose to exercise her purchase option. That option allowed Coleman to buy the Jeep by paying the "Residual Value" of the vehicle at the end of the lease, plus additional taxes and fees. The agreement stated that the residual value of the vehicle at the end of the lease would be $9,398.40.

At some point, Coleman fell behind in her payments, which was defined as a default under the parties' agreement. The lease provided DaimlerChrysler with a number of options in the event of such a default, and the company chose to take possession of the vehicle upon Coleman's voluntary surrender and to sell it. The lease also established a formula for determining Coleman's liability in the event of an early termination of the lease. The proceeds from the sale of the Jeep Cherokee were inadequate to pay off Coleman's remaining liability under this formula, and DaimlerChrysler filed a "Complaint on a Lease Agreement and Deficiency Balance," seeking recovery of the balance.

DaimlerChrysler subsequently moved for summary judgment on the complaint, and Coleman opposed the motion on the ground that the company had failed to show that its sale of the Jeep Cherokee was

---

[1] Section 9-610 (b) of the UCC requires that a creditor who sells collateral repossessed from a debtor must do so in a commercially reasonable manner. OCGA § 11-9-610 (b).

commercially reasonable as required by Article 9 of the UCC. The trial court initially denied the motion for summary judgment, but upon DaimlerChrysler's motion for reconsideration granted summary judgment, holding that Article 9 did not apply to the parties' lease agreement.

Coleman contends that this holding was error because the trial court left "unresolved the factual question as to whether the lease was not a 'true lease' but rather a disguised security agreement to which the provisions of Article 9 of the UCC applies." In support of her argument that the agreement creates a security interest, Coleman points to the terms providing that (1) she was responsible for repairs, maintenance, taxes and insurance; (2) she paid a capitalized cost reduction, which she equates with a down payment; and (3) she had the option to purchase the vehicle at the end of the term.

"Whether a transaction creates a lease or security interest is determined by the facts of each case." OCGA § 11-1-201 (37). And this Court has previously held that the existence of contract provisions requiring the lessee to pay repairs, taxes and insurance, while common in security agreements, is not determinative of whether the agreement establishes a security interest. *Mejia v. C & S Bank*, 175 Ga. App. 80, 81-82 (332 SE2d 170) (1985). See also OCGA § 11-1-201 (37). "Likewise, a down payment on the lease does not create a secured transaction." (Citations omitted.) *Summerhill Neighborhood Dev. Corp. v. Telerent Leasing Corp.*, 242 Ga. App. 142, 143 (1) (528 SE2d 889) (2000). Rather, this Court has held that the "best test" of a purported motor vehicle lease agreement requires an examination of the option to purchase the vehicle at the end of the lease. *Mejia v. C & S Bank*, 175 Ga. App. at 82.

Later, in 1993, the Georgia legislature adopted a revised version of UCC § 1-201 (37), which defines the distinction between a "true lease" and a security interest in an agreement involving such a purchase option, focusing the "inquiry on the economics of the transaction, not the intent of the parties." *Zions Credit Corp. v. Rebel Rents*, 291 BR 520, 526 (C.D. Cal. 2003) (construing Utah Commercial Code adopting language of uniform statute). See also OCGA § 11-1-201 (37); Ga. L. 1993, pp. 633, 694-697, § 3. The portions of this revised section that appear to be relevant to this case provide that

> a transaction creates a security interest if [1] the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and . . . [2] [t]he lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

OCGA § 11-1-201 (37). Conversely, "[a] transaction does not create a security interest merely because it provides that . . . [t]he lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed." Id.

Courts construing this UCC provision have referred to the initial two-part analysis as the "Bright-Line Test." Under this test,

> [i]f the consideration the lessee must pay for the term of the lease is not subject to termination by the lessee, then the transaction meets the first prong of the test. If a determination is made that a debtor's payment obligation under a purported lease is not subject to termination, then the second prong of the test must be satisfied in order to find a security interest as a matter of law. The second part of the Bright-Line Test looks to whether any of the so-called "Residual Value Factors" is present.

(Citations omitted.) *In re QDS Components*, 292 BR 313, 332 (S.D. Ohio 2002). Here, the pertinent residual value factor for the second prong appears to be whether the agreement allowed Coleman to purchase the car for no additional consideration or for nominal additional consideration.

Courts construing this provision have determined that the first prong of the test "focuses not on whether a lessee has a contractual right to terminate under the agreement in question," but rather upon whether the consideration the lessee owes under the agreement for the right to possess and use the vehicle for the term of the lease is subject to termination. *In re QDS Components*, 292 BR at 334. Thus, the issue under this prong is whether Coleman had the right to voluntarily terminate her payment obligation under the agreement. See id.; *Zions Credit Corp. v. Rebel Rents*, 291 BR at 527.[2]

With regard to the second prong of the test, the UCC itself provides guidance by defining what is meant by nominal additional consideration. OCGA § 11-1-201 (37) (x) states that "[a]dditional consideration is not nominal if . . . when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed." But "[a]dditional consideration *is* nominal if it is less than the lessee's reasonably predictable cost of performing under the

---

[2] And even where an agreement contemplates early termination, at least one court has examined the option to determine whether the payments required thereunder are so economically harsh and unreasonable, as to effectively render the right of termination meaningless. See, e.g., *In re Hicks*, 2002 WL 32667510 (Bankr. D. Kan. 2002).

lease agreement if the option is not exercised." (Emphasis supplied.) OCGA § 11-1-201 (37) (x). Thus, as explained in the comments to the UCC:

> [t]here is a set of purchase options whose fixed price is less than fair market value but greater than nominal that must be determined on the facts of each case to ascertain whether the transaction in which the option is included creates a lease or a security interest.[3]

Official Comment to UCC § 1-201 (37) (West 2002).

The application of the Bright-Line Test, however, does not necessarily end the analysis. If it is determined that the Bright-Line Test establishing a security interest as a matter of law has not been met, then the court still must examine all the facts and circumstances of the case to determine whether the agreement is a true lease or a disguised security agreement. *In re QDS Components*, 291 BR at 333. "The key issue the Court must determine is whether the lessor retains a meaningful residual interest at the end of the lease term." (Citations and punctuation omitted.) Id. "If there is a meaningful reversionary interest . . . the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security agreement, not a lease." (Punctuation omitted.) Id., quoting James J. White & Robert S. Summers, Uniform Commercial Code, vol. 4, § 30-3, 30 (5th ed., West 2002).

Despite Georgia's adoption of this UCC provision, however, neither of the parties addresses these factors in its briefs before the trial court or before this Court on appeal. And it appears that the trial court did not consider these factors in ruling upon summary judgment, as the court's order cites only case law that predates Georgia's adoption of the revised UCC section and makes no mention of the factors outlined above. See *C & S Nat. Bank v. Thomas*, 188 Ga. App. 312 (372 SE2d 687) (1988); *Mejia v. C & S Bank*, 175 Ga. App. at 81-82. We find, therefore, that the trial court's grant of summary judgment in this case was premature, as the court failed to apply the revised provisions of the UCC to the parties' agreement. Accordingly, we vacate the trial court's summary judgment order and remand for consideration of the agreement under the appropriate UCC standard. See *Hewett v. Raytheon Aircraft Co.*, 273 Ga. App. 242, 246 (1) (614

---

[3] "In order to determine the meaning and purpose behind the enactment of a Georgia Commercial Code provision that is taken verbatim from the UCC, we turn to the UCC Official Comments for assistance. [Cit.]" *Metzger v. Americredit Financial Svcs.*, 273 Ga. App. 453, 457, n. 3 (615 SE2d 120) (2005).

SE2d 875) (2005) (motion to dismiss); *DeKalb County v. C. W. Matthews Contracting Co.*, 254 Ga. App. 246, 248 (562 SE2d 228) (2002) (summary judgment).

*Judgment vacated and remanded. Smith, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 14, 2005.

*Irby A. Meadors*, for appellant.
*Andrew R. Bickwit*, for appellee.