**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 07-1011**

─────────────

RICHARD C. LITMAN, Trustee, under a Land
Trust Agreement date September 21, 1995,

                                    Plaintiff - Appellant,

        and

LITMAN LAW OFFICES, LTD.,

                                    Plaintiff,

        versus

TOLL BROS., INC.,

                                    Defendant - Appellee.

─────────────

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  T. S. Ellis, III, Senior
District Judge.  (1:06-cv-00476-TSE)

─────────────

Argued:  December 6, 2007        Decided:  February 5, 2008

─────────────

Before MICHAEL and KING, Circuit Judges, and Catherine C. BLAKE,
United States District Judge for the District of Maryland, sitting
by designation.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

**ARGUED:** William Francis Krebs, BEAN, KINNEY & KORMAN, P.C., Arlington, Virginia, for Appellant. Alexander Young Thomas, REED SMITH, L.L.P., Falls Church, Virginia, for Appellee. **ON BRIEF:** James R. Schroll, Thomas W. Repczynski, Christopher A. Glaser, BEAN, KINNEY & KORMAN, P.C., Arlington, Virginia, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Richard Litman, as trustee for Litman Law Offices, Ltd. ("Litman"), appeals the district court's grant of summary judgment to Toll Brothers, Inc. ("Toll"), in this dispute between Litman and Toll stemming from an agreement for the sale of redevelopment property in Arlington County, Virginia. For the reasons articulated below, we affirm.

I.

The essential facts are undisputed, and the most relevant are set forth here. On May 12, 2005, Litman and Toll entered into an agreement (the "Agreement") for the sale of land owned by the Litman Law Offices, Ltd. [1] J.A. 18-33. The subject of the Agreement was a one-acre parcel, with commercial office building, in Arlington, Virginia - specifically, within the Columbia Pike Special Revitalization District. Under the Agreement, Litman was to turn over a vacant building, which Toll would demolish. Because Toll intended to redevelop the property with mixed residential and commercial units, the closing was expressly conditioned upon Toll's obtaining the appropriate governmental permits.

The Agreement sets out the sale of the Columbia Pike property from Litman to Toll, at a price of $90 per saleable square foot. The number of saleable square feet is to be determined by the "total square footage contained within all condominium units on the

---

[1] An Amendment to the Agreement was executed on June 16, 2005. J.A. 65-71.

Property as shown on and defined in the recorded Condominium Documents." J.A. 19. The Agreement set a minimum purchase price, however, of $13 million.

The document outlines a series of payments to be made by Toll: within ten days of the Agreement, a $300,000 deposit, to be held in escrow until after the due diligence period; and a second deposit of $1 million, half of which would be released by the end of the due diligence period and half of which would be withheld until the approval of Toll's zoning application. The closing date was set as ninety days after the provision of a written notice of closing; the Agreement specifies, however, that Toll could not provide such notice later than February 15, 2006. Accordingly, the latest possible date anticipated for closing was May 16, 2006. Litman could, however, elect to extend the closing date to July 31st by giving Toll written notice within 45 days of receiving Toll's closing notice. Section 20 of the Agreement states that "TIME IS OF THE ESSENCE AS TO ALL PROVISIONS OF THIS CONTRACT." J.A. 30.

Should Toll fail to perform any of its obligations under the contract, the $1.3 million deposit could be retained by Litman as the "sole and exclusive remedy for such breach as liquidated damages," provided that Litman had given Toll written notice of the breach. J.A. 23. Toll's default also would result in a transfer to Litman of Toll's interests in the zoning application, all architectural and other studies, and all building drawings and permits.

4

Section 16A of the Agreement expressly conditions Toll's obligation to complete closing upon, in relevant part: "(iii) the receipt by Buyer of final, unappealable Special Exception for the Property." J.A. 28. Section 15G defines the Special Exception:

> Following the end of the Due Diligence Period, Buyer, at Buyer's sole cost and expense, may seek a special exception for the Property and/or any other government or other authorizations Buyer deems necessary, *in its sole discretion*, to develop the Property for use as residential and commercial condominium(s) (collectively, the "Special Exception").

J.A. 27 (emphasis added).[2] That section further provides that Litman would cooperate with Toll's attempts to obtain final approval of the Special Exception. Should the conditions listed in Section 16A not be satisfied, Section 16C of the Agreement as amended lists Toll's options as the following:

> If on or before the date Closing [sic] all contingencies and conditions specified herein are not or cannot be satisfied, then Buyer shall have the option of (i) completing Closing hereunder if it so chooses, or (ii) canceling this Agreement if the Special Exception is denied and the date for filing an appeal has expired, in which case this Agreement shall become null and void and the Deposit shall be returned to Buyer, provided that any Released Deposit shall be returned to Buyer when and as provided in the Note, the provisions of which are incorporated herein by reference, or (iii) in the event the unsatisfied condition is outside of Buyer's control, extending Closing until such condition is satisfied.

J.A. 28, 68.

From the summer of 2005 until November of that year, Toll pursued the Special Exception through an Arlington County zoning process known as the Form Based Code ("FBC"). Within the Columbia

---

[2]This provision was later amended but Toll retained discretion. J.A. 67.

5

Pike Special Revitalization District, properties may be developed through either of two processes: the FBC process or the traditional Site Plan Approval Procedure, which is governed by the Arlington County Department of Community Planning, Housing and Development Administrative Regulation 4.1 (generally, "4.1 process"). The FBC was developed as a streamlined alternative to the 4.1 process; its goal is "to codify the community's vision for development and redevelopment in the Columbia Pike corridor of the County." J.A. 135. The FBC "addresses primarily the form of the building, rather than just its usage." J.A. 135. Once a development is determined to meet the strictures of the FBC, approval comes quickly; a submission may be processed in anywhere from 45-60 days.

By contrast, the 4.1 application is more cumbersome: it requires that the applicant produce a series of studies and analyses, including, *inter alia*, a certified survey plat, a Transportation Demand Management Plan, and a Tree Preservation Plan. An administrative review period of 120 to 150 days is required from the date the Arlington County Board ("the Board") accepts an application to the date the Board will consider the application. Applications which include rezoning or vacation requests that would necessitate changes to the elements of the General Land Use Plan require a minimum of 150 to 180 days.

Prior to executing the contract, Toll had hired George Dove, a local architect, to perform initial assessments of the development prospects for the Litman site; it had also hired

6

Catherine Puskar, a local land use attorney. In late spring or early summer of 2005, Dove, who had experience working on FBC projects, undertook informal meetings with Arlington County staff, including the County's Deputy Zoning Administrator and Columbia Pike Initiative Coordinator, Richard Tucker, with respect to the Toll site. At those meetings, Tucker "did not object" to conceptual plans regarding the Litman site, which were consistent with other Dove-designed projects that had been approved under the FBC. J.A. 135. These plans included occupiable residential space in the building's dormers. J.A. 591.

A series of changes in the acceptability of those plans occurred throughout the fall. The first change involved the building's mezzanine level; Tucker informed Dove that because a mezzanine was part of the first floor, it must meet the use regulations for that floor - specifically, that the mezzanine must be retail, and not residential, in nature. According to Dove, Toll "changed the project accordingly and eliminated [the mezzanine]." J.A. 572.

The second change, more pertinent to the instant case, developed in stages and dealt with occupiable space in the building's dormers. At some point, the interpretation of the FBC regarding dormers changed; originally, occupiable space - in the form of a dormer - was considered appropriate "in order to encourage varying roof lines." J.A. 586. Tucker described dormers as "additional occupiable space that's available for the developer to build." J.A. 588. This interpretation clashed with

7

the FBC's six-floor limit on developments.  To comply with the six-floor limit, developers could have individual units that were two stories, with one floor within the unit being a dormer.  The dormer floor could have occupiable residential space, so long as it was connected to the sixth-story unit and did not have its own central stairway, hallway or elevator access.  Dove referred to these as "dormer duplexes" and presented the county with an amended development plan; Tucker noted that the new plan "was, as far as staff was concerned, acceptable."  J.A. 593.

Arlington citizens did not respond well to the "dormer duplex" idea; in Tucker's words, they "felt like six stories should be six stories, and we shouldn't have or encourage development beyond that." J.A. 587.  The Board formed a working group of citizens and developers to work through the dormer and other issues; Litman was a member of the group.  Throughout the summer and fall, Tucker and his team formulated a staff report, ultimately recommending that "dormer" be redefined to exclude all non-ornamental uses.  Tucker states that "by the October time frame, [Toll] was aware that no occupiable space above the 6th floor would be allowable."  J.A. 593.  Catherine Puskar disputes this; she claimed that because the Board eventually deferred several other changes that it was examining at the same time as the dormer issue, it was not until the official action was taken at the November 15th board meeting that Toll realized it had lost the dormer issue.

Puskar, Tucker and Dove were unanimous, however, in describing the Board's position on the dormer issue as fluid, or evolving, throughout the fall of 2005. After the November 15th board meeting, it would not have been possible for Toll to submit an FBC application; the county simply would not accept applications that were not in conformity with the code. At that point, Puskar advised Toll that it should begin to pursue a Special Exception through the 4.1 process. On December 1, Toll set a January 2006 submission deadline for its 4.1 application.

On January 16, 2006, Toll submitted a preliminary Major Site Plan Amendment to the department of planning. Although the application was not complete, it was deemed "in the best shape, by far, of any site plan application" that the county employee who received it had ever checked in. J.A. 806. Litman wrote the Zoning Administrator to consent to the filing of the application, J.A. 807, and told Toll's Vice President that he thought Toll was "very smart" to pursue the 4.1 process, J.A. 871. In practice, developers often submitted several rounds of submissions before an application was deemed complete by the county; the county notified Toll of several missing elements of the application, including a Traffic Impact Analysis. Toll requested the traffic analysis in January and received a completion estimate from the company of four to six weeks; the field analysis was performed in February. Toll's application, which it submitted on March 17th, was deemed complete and accepted by the county on April 24, 2006.

The following day, when it was clear that Toll could not obtain the Special Exception in time for the May 12 closing date, Litman sued in the Circuit Court for Arlington County Virginia, seeking a declaratory judgment that the failure to obtain a Special Exception within the time frame was within Toll's control.[3] The case was removed to the Eastern District of Virginia under diversity jurisdiction, and after discovery the parties filed cross-motions for summary judgment. The district court issued not one but two decisions in the case; after a hearing on October 27, 2006, Judge Ellis denied Litman's motion for summary judgment and granted summary judgment in favor of Toll, carefully explaining that the material facts were undisputed, that Toll had no control over the county's decision to change the FBC, and that the question was whether Toll had acted unreasonably or in bad faith in exercising its discretion under the Agreement, which the judge found that it had not. J.A. 239-53. Judge Ellis nonetheless invited Litman to file a motion for reconsideration; after another hearing, the motion to reconsider was denied on similar grounds. J.A. 323-41. The court's final order granting Toll's motion for summary judgment was entered December 1, 2006, J.A. 350; Litman noted a timely appeal. J.A. 351.

---

[3]Toll nevertheless gave notice on May 15, 2006, that it sought to extend the closing date under Section 16C(iii). J.A. 479-81. It had previously notified Litman, in February 2006, that it was "highly likely" that Toll would need to exercise its right to extend the closing, and that Toll would "coordinate with [Litman] as [it had] more information on the timing of the process for the Special Exception." J.A. 72.

The county held hearings on Toll's 4.1 application in July and a meeting in August; the application ultimately was denied on October 24, 2006. Litman appealed the denial to the Arlington County Circuit Court.

## II.

The standard of review of a grant of summary judgment is de novo. M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hospital, Inc., 981 F.2d 160, 163 (4th Cir. 1992) (en banc). All facts and inferences must be viewed in the light most favorable to the non-moving party. Bank of Montreal v. Signet Bank, 193 F.3d 818, 826 (4th Cir. 1999).

## III.

Under Virginia law, "where a contract is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." Harris v. Woodrum, 350 S.E.2d 667, 669 (Va. App. 1986) (quoting Berry v. Klinger, 300 S.E.2d 792, 796 (Va. 1983)). Courts must be "justly prudent and careful in inferring covenants or promises, lest they make the contract speak where it was intended to be silent, or make it speak contrary to what, as may be gathered from the whole terms and tenor of the contract, was the intention of the parties." So. Ry. Co. v. Franklin & Pittsylvania R.R. Co., 32 S.E. 485, 486 (Va. 1899). However, "what is necessarily implied is as much a part of the instrument as if plainly expressed, and

11

will be enforced as such." Pellegrin v. Pellegrin, 525 S.E.2d 611, 614 (Va. App. 2000) (quoting Va. Ry. & Power Co. v. Richmond, 106 S.E. 529, 539 (1921).

As the district court noted, the Agreement implicitly requires Toll, before taking advantage of Section 16C(iii), to file an application for a special exception. J.A. 246-47. In Southern Railway, the Virginia Supreme Court determined that the road lease at issue included the implied condition that the road be maintained and operated during the entirety of the lease. 32 S.E. at 486. In so concluding, it observed that the other clauses of the contract demanded such a construction; there would be no "*annual* expenses of *running* the road, and of keeping it and the equipment in repair, nor *receipts* to pay them, unless the road was operated." Id. at 487. Moreover, the lease imposed an obligation to furnish rolling stock and equipment for the use and enjoyment of the road, "and to use it was to operate the road." Id.

Similarly, the language of the Agreement contemplates that, should Toll wish to rely upon nonpossession of a Special Exception as a condition of delaying closing, it must have applied for a Special Exception. The language of 16A(iii) establishes the "receipt by Buyer of final, unappealable Special Exception for the Property" as a condition of closing. J.A. 28. Clearly, in order for Toll to receive a zoning exception from the Arlington county government, it must have applied for one. Indeed, the Agreement contemplates that Toll may make just such an application - Section 15G as amended refers to seeking "(ii) a special exception for the

12

Property and/or (iii) any other government or other authorizations Buyer deems necessary, in its sole discretion, to develop the Property." J.A. 67. The immediately succeeding section, 15H, notes that "Buyer shall pursue the Approvals and permits necessary for the satisfaction of the conditions to Closing at its sole cost and expense." J.A. 27.

Nowhere in the Agreement, however, is there a condition - explicit or implicit - establishing a time frame within which Toll would have to have filed an application for a Special Exception. Nor is it apparent from the text that the parties intended to impose such a time frame on Toll. Indeed, the "sole discretion" language that appears in both the original and amended versions of Section 15G seems to contradict any rigidity that Litman now seeks to impose on Toll. J.A. 27, 67.

On appeal, Litman argues that the "time is of the essence" clause meant that Toll was required to file its application by a certain date. Litman proposes that although Toll may have had the "sole discretion" as to "*what* it submitted and *which* governmental approvals it could seek and accept," the time-essence provision "limit[ed] the *when* of any such submissions or requests." (Appellant's Reply at 20.) We disagree. It is not reasonable that a contract which purports to give Toll "sole discretion" to act with regard to the seeking of a zoning exception would at the same time impose external deadlines upon the company, essentially requiring it to begin the 4.1 process even before it was clear the FBC application could not succeed. As the district court noted,

13

"the contract says nothing about how or when Toll Brothers applies for that [] authorization." J.A. 248; see also J.A. 331-32. Moreover, were Toll to have been successful in seeking an exception under the FBC process, the 120 - 150 day deadlines to which Litman refers would have been irrelevant.

We must next determine what standard applies to Toll's exercise of discretion under the Agreement. Toll's discretion is not unlimited; "a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 542 (4th Cir. 1998) (citing Steven J. Burton & Eric G. Anderson, Contractual Good Faith 46-47 (1995) ("Thus, contractual discretion is presumptively bridled by the law of contracts-by the covenant of good faith implied in every contract.")) Accordingly, the determination becomes whether Toll acted reasonably, or in good faith, in deciding to pursue a 4.1 application, [4] and in filing the application when it did. We conclude that it did.

Litman has attempted to portray the FBC's position with regard to the dormer issue as being increasingly negative; it claims that Toll should have known in the summer of 2005 that the County would not approve its design. Whether or not this

---

[4]In discussing the standard of discretion to be applied to Toll's actions, the district court referred, alternately, to "unreasonable[ness]," "bad faith" and "[abuse of] discretion." J.A. 249. We agree with the district court that "there is a certain implicit discretion on the part of Toll Brothers to when and how it applies [for the Special Exception]," J.A. 249, and Toll's behavior was acceptable regardless of which phrasing of the standard is applied.

14

characterization is accurate, what is certain is that Dove's initial dormer plans were greeted warmly by Tucker in late spring/early summer of 2005; that the citizen group's feelings about the dormer issue became stronger throughout the summer and fall; and that despite the best efforts of Litman, among others, the county disallowed occupiable dormer space under the FBC on November 15, 2005. As the district court pointed out, "Litman concedes that the decision to pursue the special exception through the process at that time made sense." J.A. 251. Right up until the official change to the FBC, Litman and the working group continued to discuss whether there was any way to meet the community's demands while providing Toll the project density it needed. Indeed, as late as December 2005 - after the FBC had been amended - Litman and Toll encouraged the county to consider a "loft" level as an acceptable replacement for dormer space. Emails from Litman to Puskar, Dove, and executives at Toll suggest that the county took the suggestion seriously, J.A. 1168-72, though it did not ultimately approve such a change.

Given the state of flux surrounding the dormer issue, Toll cannot be said to have acted in bad faith in pursuing a special exception under the FBC process until November 2005.[5] The

---

[5]It should also be noted that it was not unreasonable for Toll to pursue a Special Exception via the FBC, instead of preparing a 4.1 application from the outset; Puskar points out that a "Special Exception sought for the Property through a 4.1 Site Plan Amendment application at the outset would have stood no chance at all, as the FBC itself . . . was designed as the vehicle for redevelopment of the Columbia Pike Corridor." J.A. 844.

15

district court referred to the series of events leading up to November thusly: "for a long time [obtaining approval under the FBC] was possible. Then in November it became impossible, and then [Toll] had to put together a new application." J.A. 331. The November 15th decision was the first official word from the county that Toll's proposed design would be unacceptable, and it was after that date that Toll began to prepare its 4.1 application. The emails referenced above reveal that Toll pursued its application even given Litman's suggestion that lofts might be an acceptable way to achieve the projected density.

Eight weeks expired between the county's official revision of the FBC and Toll's initial 4.1 submission; Dove states, and Litman does not dispute, that this was a very short period of time in which to prepare such an application. According to William Holmes, a Vice President of Toll, Richard Litman told him that he thought Toll was "very smart" to file a 4.1 Site Plan Amendment, because it would force the county to work with Toll on approval of the initial plans. J.A. 871.

Litman also argues that Toll's failure to obtain a traffic impact analysis far enough in advance of the spring submission deadlines is sufficient to raise a question of Toll's bad faith. It remains true, however, that under the 4.1 regulation, a traffic impact analysis was not due until the final submission of the application. Of course, had Toll been able to obtain an exception under the shorter FBC process, a January 2006 request would have provided ample time for the traffic analysis to be conducted.

16

Although it may have been more prudent for Toll to have requested the traffic analysis when it first decided to pursue the 4.1 application, the fact that it did not do so is not evidence of bad faith.

Finally, Litman claims that Toll knew that any 4.1 application that contained either residential mezzanines or dormers would be denied by the county, and that Toll continued to seek an exception under 4.1 solely to obtain this denial. Under the amended Section 16C(ii), this would trigger Litman's obligation to return Toll's deposit.[6] The implication appears to be that the contract obligated Toll to proceed to closing, even at the cost of scaling back the initial profitability of the project. This argument is undercut by the very terms of the Agreement, which identified decisions concerning the Special Exception as being within Toll's "sole discretion" in both Sections 15G, J.A. 67, and 16B, J.A. 28. Moreover, as the district court observed, "Litman appealed . . . the Zoning Board's decision to deny Toll Brothers' application, alleging that the board acted in an unreasonable, arbitrary, capricious and discriminatory manner when it denied Toll's complete and acceptable application." J.A. 336.

The district court concluded that no reasonable jury could find that Toll acted unreasonably or in bad faith. J.A. 333. In so concluding, it noted that the parties had filed cross-motions

---

[6]Indeed, Litman's interest in retaining Toll's deposit appears to be a major reason for this litigation.

for summary judgment and that the facts were largely undisputed. J.A. 332. We agree that there are no undisputed material facts, and the mere fact that it may have been possible for Toll to act more expeditiously is not sufficient to substantiate Litman's claims that Toll breached the Agreement.

IV.

For the foregoing reasons, the decision of the district court granting summary judgment to Toll is affirmed.

AFFIRMED