A07A2023. PLANNING TECHNOLOGIES, INC. et al.
v. KORMAN.
(660 SE2d 39)

BERNES, Judge.

Defendants Planning Technologies, Inc. ("PTI"), Arturo H. Sanchez, and Ronald G. Spencer appeal the trial court's grant of partial summary judgment in favor of plaintiff Peter J. Korman on his claim for breach of a stock option agreement. For the reasons discussed below, we vacate the trial court's order granting summary judgment and remand with instruction.

> On appeal from a grant of summary judgment, we review the evidence de novo, viewing it in the light most favorable to the nonmovant, to determine whether the trial court erred in concluding that no genuine issue of material fact remains and that the moving party was entitled to judgment as a matter of law.

(Citation omitted.) *Briddle v. Cornerstone Lodge of America*, 288 Ga. App. 353, 353-354 (654 SE2d 188) (2007).

So viewed, the record reflects that PTI is a Georgia corporation founded by Sanchez and Spencer that provides infrastructure consulting services to clients involved in e-business. In 1997, PTI hired Korman to serve as president of the corporation. Korman later assumed the roles of chief operating officer, secretary, and treasurer.

*The Stock Option Plan and Agreement.* In 1998, PTI adopted its Stock Incentive Plan (the "Plan") to secure for itself and its shareholders "the benefits of the incentive inherent in stock ownership in [PTI] by employees . . . who are responsible for its future growth and continued success." The Plan set out general terms and conditions for the grant of stock options and delineated how the Plan would be administered by PTI. Article 3.1 provided that "[t]he Plan shall be administered by the Board of Directors or by any other Committee appointed by the Board that is granted authority to administer the Plan." The Plan also contained several other articles addressing the administration of the Plan:

> 3.2 *Authority of the Committee.* Subject to the provisions of the Plan, the Committee shall have full power to . . . construe and interpret the Plan and any agreement or instrument

entered into under the Plan. . . . Further, the Committee shall make all other determinations which may be necessary or advisable in the Committee's opinion for the administration of the Plan.

3.3 *Decisions Binding.* All determinations and decisions made by the Committee pursuant to the provisions of the Plan and all related orders and resolutions of the Board shall be final, conclusive and binding on all Persons, including [PTI], the shareholders, Employees, Participants and their estates and beneficiaries.

. . .

6.5 *Exercise of Options.* Options granted under the Plan shall be exercisable at such times and be subject to such restrictions and conditions as the Committee shall in each instance approve. . . .

Korman and PTI subsequently executed the Stock Option Agreement (the "Agreement"), which awarded Korman options on 2,500,000 shares of PTI common stock. The options awarded to Korman were scheduled to vest over three years, one-third each in August 1998, August 1999, and August 2000. Significantly, however, there was an exception to the three-year vesting schedule set out in Section 6.1 of the Agreement, which stated that "[u]pon a Change in Control (as defined in the Plan), all outstanding unvested Options shall become immediately and fully exercisable." Article 13.1 (b) of the Plan defined a "Change in Control" as, among other things, "[t]he approval by the shareholders of [PTI] of a reorganization, merger, consolidation, complete liquidation or dissolution of [PTI], the sale or disposition of all or substantially all of the assets of [PTI] or similar corporate transaction."

The Agreement also contained several sections addressing how it would be interpreted and how disputes involving the Agreement and the Plan would be resolved. Specifically, the Agreement recited that Korman "hereby acknowledges receipt of a copy of the Plan and agrees to be bound by all the terms and provisions thereof" and provided that "[t]he legal construction and interpretation of this Agreement . . . shall be governed by the Plan." The Agreement further provided:

19. *Resolution of Disputes.* Any dispute or disagreement which may arise under, or as a result of, or in any way relate

to, the interpretation, construction or application of this Agreement shall be determined by the Committee. Any determination made hereunder shall be final, binding and conclusive on [Korman] and [PTI] for all purposes.

Finally, the signature page of the Agreement stated that Korman "hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board of Directors of [PTI] . . . upon any questions arising under the Plan."

*The Transaction.* On March 31, 2000, PTI closed a deal with the Enterprise Network Systems ("ENS") division of the iGate Corporation that was approved by PTI's shareholders via written consent (the "ENS Transaction"). The terms of the ENS Transaction were memorialized in an indexed binder of documents entitled "Conversion of Series A Preferred and Contribution Agreement" (the "Contribution Agreement"). In general terms, the ENS Transaction involved ENS contributing $5,500,000 in cash and substantially all of its assets to PTI in return for 32,402,137 shares of PTI common stock. Both before and after the closing, PTI's Board of Directors determined that the ENS Transaction did not constitute a change in control under the Plan and Agreement and, therefore, would not accelerate the vesting of employee stock options.[1]

On April 10, 2000, Korman attempted to exercise his remaining stock options that were scheduled to vest in August 2000. Korman contended that the ENS Transaction was a change in control that had accelerated the vesting of his remaining stock options under the Plan and the Agreement. PTI's Board disagreed and refused to issue the shares to Korman. On April 19, 2000, PTI informed Korman that he was being terminated for cause based on alleged acts of fraud and insubordination.

*The Litigation.* Following his termination, Korman brought the present suit in which he asserted numerous claims, including that PTI had breached the Agreement by refusing to issue him shares of PTI common stock when he exercised his remaining stock options in April 2000. Korman later moved for partial summary judgment on his claim for breach of the Agreement, and appellants cross-moved for partial summary judgment on the same claim. The trial court thereafter ruled that the ENS Transaction was a change in control that accelerated the vesting of Korman's stock options as a matter of law, granted partial summary judgment in favor of Korman and against

---

[1] There is no evidence in the record that a Board committee was ever created by PTI to administer the Plan. Rather, the record reflects that the Board itself made decisions concerning the Plan and Agreement pursuant to Article 3.1 of the Plan.

appellants, and certified the order as a final judgment pursuant to OCGA § 9-11-54 (b). This appeal followed.

Appellants contend that the trial court improperly treated the change of control issue as a matter to be analyzed de novo, rather than properly deferring to the determination by PTI's Board of Directors that the ENS Transaction did not constitute a change in control under the Plan and the Agreement. According to appellants, the Plan and the Agreement gave the Board absolute and uncontrolled discretion in making the determination of whether a particular transaction constituted a change in control, such that Korman has no contractual basis for challenging the Board's determination. Alternatively, appellants argue that the determination of the Board must be treated as final and conclusive as to all parties unless the Board acted in bad faith or failed to exercise honest judgment, which appellants contend did not occur in this case.

Where an agreement gives a party discretionary decision-making authority, the question is not whether the decision was erroneous; rather, the sole question for a court in reviewing whether the agreement has been breached is whether the decision was made in good faith and involved the exercise of honest judgment. See *State Hwy. Dept. v. MacDougald Constr. Co.*, 189 Ga. 490, 502 (2) (6 SE2d 570) (1939); *Grant, Alexander & Co. v. Savannah &c. R. Co.*, 51 Ga. 348, 357 (1874); *MacDougald Constr. Co. v. State Hwy. Dept.*, 125 Ga. App. 591, 593 (1) (188 SE2d 405) (1972). But, "[i]f an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision," and there can be no breach of the agreement predicated on the decision. *Hunting Aircraft v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 453 (2) (636 SE2d 139) (2006). See *Automatic Sprinkler Corp. of America v. Anderson*, 243 Ga. 867, 868-869 (257 SE2d 283) (1979); *Knight Indus. v. Turner Marketing*, 157 Ga. App. 177, 178-179 (276 SE2d 860) (1981).

Guided by these principles, we turn to the instant case. As previously noted, Article 3.3 of the Plan provided that "[a]ll determinations and decisions made by the Committee pursuant to the provisions of the Plan and all related orders and resolutions of the Board shall be final, conclusive and binding on all Persons," and Article 3.1 made clear that the "Committee" was either the Board of Directors as a whole or a special committee appointed by the Board. In turn, Section 19 of the Agreement specifically stated that "[a]ny dispute or disagreement which may arise under, or as a result of, or in any way relate to, the interpretation, construction or application of this Agreement shall be determined by the Committee," and that any such determination would "be final, binding and conclusive" on PTI

and Korman. Moreover, the signature page of the Agreement contained a provision reciting that Korman "hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board of Directors of [PTI] . . . upon any questions arising under the Plan."

Based on the plain language of these provisions, we agree with appellants that PTI's Board of Directors was granted discretionary decision-making authority over all disputes and disagreements arising under or in any way relating to the Plan and the Agreement. Given this authority, the Board was afforded discretion in how it interpreted the terms of the Plan and the Agreement, as well as in how it interpreted the Contribution Agreement and applied the relevant facts to determine whether a change in control had occurred as a result of the ENS Transaction.

We disagree, however, with appellants' contention that the provisions of the Plan and the Agreement gave the Board absolute and uncontrolled discretion. The provisions refer to the decisions of the Board as binding, final, and conclusive — language which in previous cases we have held is not absolute and subjects the decision-making party to the standard of good faith and honest judgment.[2] See *State Hwy. Dept.*, 189 Ga. at 495, 502-506 (2); *Grant, Alexander & Co.*, 51 Ga. at 350, 357. See also *MacDougald Constr. Co.*, 125 Ga. App. at 594 (1) (noting that a decision maker is subject to the good faith standard "even though the contract specifies that the decision . . . is to be final"). Compare *Charles v. Leavitt*, 264 Ga. 160 (442 SE2d 241) (1994) (discretion was absolute where agreement stated that the party would be "the sole judge"); *Knight Indus.*, 157 Ga. App. at 178-179 (discretion was absolute where the contract stated that the defendant was vested with "complete and absolute discretion"); *Automatic Sprinkler Corp. of America*, 243 Ga. at 867-869 (discretion was absolute where contract stated that the decision was "entirely within the discretion of the corporation" and that the corporation's discretion was "absolute"). Accordingly, the trial court was required to defer to the determination of PTI's Board of Directors that the ENS Transaction was not a change in control and did not accelerate the

---

[2] Courts in other jurisdictions have similarly held that even if a corporate stock option plan or agreement states that the stock option committee has final and conclusive decision-making authority, the committee still must act in good faith. See, e.g., *Scribner v. WorldCom*, 249 F3d 902, 906, 909 (9th Cir. 2001); *Weir v. Anaconda Co.*, 772 F2d 1073, 1078-1079 (10th Cir. 1985). Cf. *Moore v. Adkins*, 576 P2d 245, 250 (Kan. Ct. App. 1978) (plan committee of a qualified employee benefit plan was required to act in good faith, even though the plan stated that the committee's determinations were final and conclusive).

vesting of Korman's stock options, so long as the Board's determination was made in good faith and involved the exercise of honest judgment.

The trial court did not apply this deferential legal framework in ruling on whether the ENS Transaction constituted a change in control as a matter of law. While the trial court concluded that the determination of PTI's Board of Directors on this issue was subject to review, and thus implicitly rejected the contention that the Board's discretion was absolute and uncontrolled, the trial court did not go on to address the limited question of whether the Board's determination was made in good faith and with honest judgment. Rather, the trial court conducted a de novo analysis of whether the ENS Transaction was a change in control as a matter of law, without paying deference to the Board's determination on this issue. Accordingly, although the trial court may ultimately determine again that partial summary judgment in favor of Korman is proper, we nevertheless vacate the trial court's order and remand with the instruction that the trial court apply the deferential framework set forth in this opinion in reviewing the evidence presented on summary judgment.[3] See, e.g., *Coleman v. DaimlerChrysler Svcs. of North America*, 276 Ga. App. 336, 339-340 (623 SE2d 189) (2005) (vacating trial court's summary judgment order and remanding for consideration under the proper legal framework).

For purposes of remand, we note that a decision was not made in good faith if it was made for arbitrary or capricious reasons, was based on an improper pecuniary motive, or was predicated on dishonesty or illegality. See, e.g., *Hunting Aircraft*, 281 Ga. App. at 452 (1); *Purcell v. Breese*, 250 Ga. App. 472, 476 (4) (552 SE2d 865) (2001). Additionally, a decision can be so grossly erroneous, as where there is a total absence of any factual evidence to support it, that it creates an inference of bad faith and dishonest judgment. *State Hwy. Dept.*, 189 Ga. at 502 (2). Similarly, "[a] contract may be so patently clear and explicit on a given point that any construction different from its obvious and exclusive meaning would constitute a gross mistake or error," but "if there is room for construction," no bad faith can be inferred. *Id.*

*Judgment vacated and case remanded. Blackburn, P. J., and Ruffin, J., concur.*

---

[3] Based on our decision, appellants' remaining enumerations of error are moot and need not be addressed.

DECIDED MARCH 17, 2008 —
RECONSIDERATION DENIED APRIL 3, 2008 — 

*L. Matt Wilson, Dustin R. Thompson*, for appellants.
*Doffermyre, Shields, Canfield, Knowles & Devine, Everette Doffermyre, Jr., Samuel W. Wethern*, for appellee.