[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12679
_____

D.C. Docket No. 1:12-cv-02277-SCJ

JOSEPH KYLE NEIBERT,

Plaintiff -
Counter Defendant -
Appellant,

versus

COMPUTER SCIENCES CORPORATION,

Defendant -
Counter Claimant -
Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 31, 2015)

Before MARCUS and ROSENBAUM, Circuit Judges, and FRIEDMAN,[*] District
Judge.

_____

[*] Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting
by designation.

PER CURIAM:

Joseph Kyle Neibert appeals from the district court's grant of final summary judgment to Computer Sciences Corporation ("CSC") on his breach of contract claim. Neibert, a former CSC salesperson, alleges that CSC breached the terms of his compensation plan when it gave him a smaller incentive payment than he allegedly deserved for his role in securing a deal to provide mainframe hosting services to the Federal Home Loan Mortgage Corporation, otherwise known as Freddie Mac. This case comes down to a question of contractual interpretation: does Neibert's compensation plan, which encompasses "[a]ll cloud and hosting services," necessarily include a mainframe hosting transaction? After thorough review, we conclude that the answer is no. The contract expressly gives CSC discretion to interpret its terms. Neibert has failed to present any evidence that CSC did not act in good faith when CSC interpreted this ambiguous phrase to exclude mainframe transactions. We, therefore, affirm the district court's grant of summary judgment to CSC.

I.

The essential facts, viewed in the light most favorable to Neibert, are these. CSC is a "global information technology services company" which offers data hosting services to businesses worldwide. CSC provides "mainframe" hosting services, which involve dedicated physical servers stored in a data center. These

data centers can range in size from a small room to many floors of an office building, and are managed by on-site information technology personnel. CSC also provides "cloud" hosting services, which involve storing data over networks that can be accessed anywhere.

Mainframe and cloud hosting services differ in several crucial respects. Mainframe services are generally perceived as more secure and reliable, and companies dealing with sensitive information often prefer a mainframe solution. In contrast, cloud services are cheaper, based on newer technology, and allow easier access to information. In recognition of these differences, CSC divides its sales personnel into two units. The Cloud Computing and Software Services unit ("Cloud Services") is tasked with selling cloud products. Cloud Services employs only "some folks" with experience in mainframe transactions, and does not typically sell mainframe services. Mainframe services are instead sold by the Infrastructure Services business unit, which contains personnel with expertise in that field. Cloud Services employees and Infrastructure Services employees are governed by distinct incentive plans because the two kinds of transactions involve different amounts of revenue and expenses and varying employee time commitments.

In spring 2011, the appellant, Neibert, was offered a position as a Specialist Sales Executive in CSC's Cloud Services division. "In recognition" of his "sales

3

role," Neibert was offered a compensation plan: the CSC Sales Incentive Compensation Agreement ("Compensation Plan"). The Compensation Plan provides that Neibert could earn an incentive payment by securing contracts for certain "Offerings and Services," defined as "[a]ll cloud and hosting services," within his geographic territory. However, Section 5.1 of the Compensation Plan stipulates that "CSC has complete discretion and final authority to administer and interpret this Plan and to resolve any disputes concerning its administration or interpretation." The Compensation Plan also contains two other relevant provisions: a choice of law clause which instructs that the Compensation Plan shall be governed by Virginia law, and a severability clause in the event any provision of the Compensation Plan is found to be unenforceable.

Throughout the course of his employment, Neibert managed several active cloud services accounts involving Freddie Mac. In May or June of 2011, a Freddie Mac representative approached Neibert about the possibility of CSC hosting Freddie Mac's mainframe. This opportunity involved CSC taking over Freddie Mac's existing data center, including mainframe hardware, the people charged with running it, and even the facility itself. A transaction of this kind would not normally be handled by the Cloud Services division, and, during his deposition, Neibert could remember only one other occasion when Cloud Services personnel managed a mainframe outsourcing deal. Indeed, Neibert admitted that such a

4

transaction was "not a [c]loud deal." Neibert presented the Freddie Mac mainframe transaction to CSC management, and was allegedly told that he would be compensated for pursuing it. CSC and Freddie Mac eventually reached an agreement regarding the hosting of Freddie Mac's mainframe on November 18, 2011, to the tune of over $30 million.

After the Freddie Mac deal closed, CSC conducted its sales credit review process, which determines how much credit each particular sales professional should receive for a given deal. CSC management concluded that the Freddie Mac mainframe transaction fell outside of Neibert's Compensation Plan, but that he nonetheless deserved special recognition for his contributions to the deal. Neibert was ultimately awarded $25,000, based on the payment he would have received under the incentive plan in place for the Infrastructure Services unit. He was, obviously, unhappy with that figure, and contends that he was instead entitled to $609,632.63 under his Compensation Plan. Neibert resigned, and eventually, filed this lawsuit.

On May 30, 2012, Neibert brought his complaint in Georgia state court, alleging breach of contract, and, alternatively, unjust enrichment claims. Citing diversity jurisdiction, CSC subsequently removed the case to the United States District Court for the Northern District of Georgia. After discovery, CSC moved for summary judgment. CSC essentially argued that because Section 5.1 gave it

complete discretion to interpret the Compensation Plan, it had a contractual right to determine whether the Freddie Mac mainframe transaction fell within the offerings for which Neibert could receive an incentive payment. Alternatively, CSC asserted that Neibert failed to show that its decision was rendered in bad faith.

After briefing by the parties, the district court granted summary judgment to CSC. The court first concluded that Section 5.1 would violate Georgia public policy if construed to divest the courts of jurisdiction. The court read Georgia law to require that CSC's exercise of discretion be reviewed under "the standard of good faith and honest judgment." The court then found it ambiguous whether the Compensation Plan includes mainframe transactions like the Freddie Mac deal. The mere fact that CSC resolved the ambiguity against Neibert, absent any other substantial evidence, did not demonstrate that CSC's interpretation was rendered in bad faith. After the district court denied his motion for reconsideration, Neibert timely appealed to this Court.

## II.

We review a district court's grant of a motion for summary judgment de novo. Myers v. Bowman, 713 F.3d 1319, 1326 (11th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the burden of proof, and the district

6

court should view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1313 (11th Cir. 2007) (quotation omitted). However, "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004).

## III.

We first examine the extent to which Section 5.1 of the Compensation Plan, which gives CSC "complete discretion and final authority to administer and interpret [the Compensation] Plan," is valid and enforceable. Applying Virginia law to Section 5.1, as stipulated in the parties' contract, we hold that CSC was required to exercise its discretion in good faith. Such a limited grant of discretion to one party to a contract does not offend the public policy of the state of Georgia, which bars contractual provisions that strip the courts of jurisdiction to resolve contractual disputes.

"In a case founded on diversity jurisdiction," we are bound to "apply the forum state's choice of law rules." Federated Rural Elec. Ins. Exch. v. R.D. Moody & Assocs., Inc., 468 F.3d 1322, 1325 (11th Cir. 2006) (per curiam). Because this case was brought in the state of Georgia, we apply Georgia's choice of law rules. The Compensation Plan itself, however, contains a choice of law

7

clause directing this Court to apply Virginia law to resolve contractual disputes. "Absent a contrary public policy, [Georgia courts] will normally enforce a contractual choice of law clause." Carr v. Kupfer, 296 S.E.2d 560, 562 (Ga. 1982). However, "[a] contract should not be held unenforceable . . . except in cases free from substantial doubt where the prejudice to the public interest clearly appears." CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc., 659 S.E.2d 359, 361 (Ga. 2008)  (quotation omitted); see also Emory Univ. v. Porubiansky, 282 S.E.2d 903, 904-05 (Ga. 1981) (explaining that Georgia courts "exercise extreme caution in declaring a contract void as against public policy").  It is, after all, "the paramount public policy" of the state of Georgia "that courts will not lightly interfere with the freedom of parties to contract." Jefferson Pilot Life Ins. Co. v. Clark, 414 S.E.2d 521, 525 (Ga. Ct. App. 1991) (quotation omitted).  We are obliged to apply Virginia law to the Compensation Plan, unless doing so would yield a result at odds with Georgia public policy.

As we see it, a Virginia court would construe Section 5.1 to require that CSC exercise its discretion in good faith.  Virginia courts read an implied duty of good faith and fair dealing into every contract. See, e.g., A & E Supply Co. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669, 676 (4th Cir. 1986); Historic Green Springs, Inc. v. Brandy Farm, Ltd., 32 Va. Cir. 98, 101-02 (Va. Cir. Ct. 1993). "[I]t is a basic principle of contract law in Virginia," the United States Court of

8

Appeals for the Fourth Circuit has explained, that "a party may not exercise contractual <u>discretion</u> in bad faith, even when such discretion is vested solely in that party." <u>Va. Vermiculite, Ltd. v. W.R. Grace & Co.- Conn.</u>, 156 F.3d 535, 542 (4th Cir. 1998); <u>see also</u> <u>Litman v. Toll Bros., Inc.</u>, 263 F. App'x 269, 274 (4th Cir. 2008) (per curiam) (stating that such discretion is not "unlimited").  Instead of reading Section 5.1 as conferring absolute discretion upon CSC, Virginia courts would review CSC's interpretations of the Compensation Plan for good faith.

Such a limited discretionary provision does not offend Georgia public policy.  In a series of cases, the Georgia courts have explained that a discretionary provision in a contract is void only if it entirely divests the courts of jurisdiction with respect to all disputes arising under the contract.  <u>See, e.g.</u>, <u>Caribbean Lumber Co. v. Anderson</u>, 422 S.E.2d 267, 268 (Ga. Ct. App. 1992) ("[P]rovisions in contracts which attempt to divest the courts of jurisdiction . . . are void as against public policy."); <u>Gettys v. Mack Trucks, Inc.</u>, 131 S.E.2d 205, 206 (Ga. Ct. App. 1963) ("A general agreement to <u>arbitrate all questions</u> which may arise in the execution of a contract, both as to liability and loss, should be treated as against public policy and void, as an attempt to oust the courts of jurisdiction." (alteration adopted) (quotation omitted)).  These decisions seem to contemplate something akin to arbitration, where a reviewing court is left with no authority other than to enforce the mandates of some other decisionmaker.

9

Indeed, in a more recent case, <u>Planning Technologies, Inc. v. Korman</u>, the Georgia appellate court drew a distinction between two forms of discretion. 660 S.E.2d 39 (Ga. Ct. App. 2008). "Where an agreement gives a party discretionary decision-making authority, the question is not whether the decision was erroneous"; instead, "the sole question" for a reviewing court "is whether the decision was made in good faith and involved the exercise of honest judgment." <u>Id.</u> at 42. But, "no duty of good faith is implied" if the agreement expressly "grants a party absolute or uncontrolled discretion in making a decision." <u>Id.</u> (quotation omitted). The court concluded that the contractual language at issue, which made one party's decisions "final, conclusive and binding," conferred only the former, more constrained kind of discretion, and enforced the provision with no mention of any public policy concerns. <u>Id.</u> at 42-43 (quotation omitted). All in all, we read <u>Gettys</u>, <u>Caribbean Lumber</u>, and <u>Korman</u> to indicate that, at the very least, a provision conferring good-faith discretion is enforceable under Georgia law.

In light of these cases, Section 5.1, when construed under Virginia law, does not offend Georgia public policy. Section 5.1 plainly does not divest the courts of jurisdiction. At no point did CSC argue that the federal courts were without authority to resolve its dispute with Neibert, and CSC even brought a number of counterclaims. Cf. <u>Caribbean Lumber</u>, 422 S.E.2d at 269 ("[T]he parties do not contend the trial court was without authority to resolve the dispute giving rise to

10

this appeal."). Moreover, the Compensation Plan itself contemplates judicial review. It contains a choice of law clause directing a reviewing court to apply Virginia law, and it also contains a severability clause which takes effect should a court invalidate some other provision of the contract. Nor does Section 5.1 leave a reviewing court with nothing to review. Under Virginia law, we must determine whether CSC's interpretations were rendered in good faith. We do not lack jurisdiction to hear disputes arising under the Compensation Plan, nor is our review so deferential as to denude it of all significance.

Neibert claims, nevertheless, that CSC argued before the district court that the courts lacked jurisdiction to hear this case at all. But CSC never contested the district court's jurisdiction. Instead, CSC argued both that it had an express contractual right to interpret the Compensation Plan -- an argument that CSC has now abandoned -- and that it interpreted the agreement in good faith. Even assuming, however, that CSC attempted to challenge the courts' jurisdiction, it did so based on an erroneous interpretation of Virginia law. As we have already explained, Virginia courts would read Section 5.1 as requiring CSC to exercise discretion in good faith, and not as extending an "explicit contractual right[]" to interpret the Compensation Plan however CSC saw fit. See Va. Vermiculite, Ltd., 156 F.3d at 542. We are not obliged to credit CSC's since-corrected view of Virginia law.

11

The bottom line is that Virginia law would read Section 5.1 to require that CSC exercise its discretion in good faith. "[E]xercis[ing] extreme caution," as we must, Porubiansky, 282 S.E.2d at 904, we cannot say that such a provision offends Georgia policy. After all, Neibert agreed to the Compensation Plan, and in light of Georgia's "paramount public policy" of freedom of contract, he cannot seek to avoid its terms now. Jefferson Pilot Life Ins. Co., 414 S.E.2d at 525 (quotation omitted). We hold, therefore, that Section 5.1 is not void.[1]

## IV.

Next, we consider whether Neibert has shown a genuine dispute of material fact as to whether CSC's interpretation of the scope of the Compensation Plan was rendered in good faith. He has not.

In defining the good faith standard, we once again look to Virginia law. Under Virginia law, a defendant acts in bad faith when it "act[s] in furtherance of its own interest, with intentional disregard of the financial interest of the [plaintiff]." Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 108 F. Supp. 2d 549, 608 (W.D. Va. 2000) (quoting State Farm Mut. Auto. Ins. Co. v. Floyd, 366

---

[1] Even if we were to conclude that applying Virginia law to Section 5.1 would violate the public policy of the state of Georgia, and we do not, it is far from clear that voiding the provision would be the appropriate remedy. It appears that, under Georgia law, a contractual provision in violation of public policy can be narrowly construed, rather than struck from the contract. Bishop v. Act-O-Lane Gas Serv. Co., 85 S.E.2d 169, 177 (Ga. Ct. App. 1954) ("[T]hat construction should be placed upon a contract which will uphold rather than avoid it.").

S.E.2d 93, 97 (Va. 1988)) (second alteration in original).  Likewise, the Second

Restatement of Contracts emphasizes "faithfulness to an agreed common purpose

and consistency with the justified expectations of the other party," as well as

considerations of fairness.  Restatement (Second) of Contracts § 205 cmt. a (1981).

It appears, therefore, that Virginia law would find a breach of the implied duty of

good faith where a party, vested with discretion, renders an interpretation of a

contract at odds with its plain meaning, or interprets the contract in disregard of the

other party's interests.  No such circumstances are present here.

Moreover, even if we applied Georgia law, the outcome of this case would

be the same.  Because the district court held that Section 5.1, read broadly, would

violate Georgia's public policy, it defined good faith in terms of Georgia law.  As

the district court explained, relying on Korman, 660 S.E.2d at 43-44, a plaintiff can

show bad faith under Georgia law by demonstrating, for example, that the

defendant's actions were arbitrary, motivated by "an improper pecuniary motive,"

or contrary to the plain meaning of the contract.  Neibert has failed to meet this

standard as well.  There is plainly "room for construction" in the Compensation

Plan, see id. at 44 (quotation omitted), and Neibert presents no evidence that

CSC's interpretation was otherwise arbitrary or improper.  Thus, whether we apply

Virginia law, as the parties agreed to do by contract, or Georgia law, which the

13

parties have applied in their argumentation, the district court was correct to grant summary judgment to CSC.

## A.

Neibert's first argument is that CSC acted in bad faith when it determined that the mainframe transaction fell outside the scope of his Compensation Plan because the plain language of that agreement includes all "hosting"-related deals, whether mainframe or cloud. Both parties accept that the Freddie Mac transaction was, in substance, a mainframe transaction. We ask, therefore, whether the Compensation Plan is ambiguous, and, if so, whether CSC's interpretation of that contract to exclude mainframe transactions is reasonable. The answer to both questions is yes.

The Compensation Plan defines the eligible "Offerings and Services" this way:

> All cloud and hosting services, including but not limited to CloudCompute, BizCloud, Managed Hosting, SaaS, PaaS, SAP IU, CloudLab, CloudTest, CloudExchange, and others as developed and available.

As we see it, and as the district court concluded, this clause is plainly ambiguous as to whether it includes mainframe hosting transactions. "All cloud and hosting services" could mean any number of things. It could mean what Neibert says it means: all cloud services, as well as all hosting services, whether cloud or mainframe-related. Or, as the district court thought, it could mean "cloud related

14

services, which includes cloud hosting services." It could even mean a third option, namely, all services pertaining to both cloud and hosting, or essentially only cloud hosting services. The language of the clause itself does not indicate what the parties intended. All we can say for sure is that "cloud hosting services" were clearly meant to be included; whether the clause includes other forms of services is an open question. We cannot say that CSC's resolution of this ambiguity was unreasonable.

The representative list of examples of offerings also provides powerful evidence that the parties did not intend to include mainframe transactions within the scope of the Compensation Plan. Each of these examples appears to pertain to cloud-related services. Neibert cannot point to a single example that exclusively or substantially pertains to mainframe services. It was not unreasonable for CSC to conclude that a provision which refers to, among other things, "CloudCompute, BizCloud, . . . CloudLab, CloudTest, [and] CloudExchange," included only cloud transactions. While the clause "includ[es] but [is] not limited to" these services, the examples that were chosen suggest that the clause was targeted at similar but unspecified services.

Moreover, CSC's reading of the Compensation Plan makes good sense in light of the contract's purpose. The Compensation Plan was executed to compensate Neibert for his employment in CSC's Cloud Services division, through

which he sold cloud services. There is undisputed record evidence that employees in CSC's mainframe division belonged to a separate compensation plan with a different -- and apparently, less generous -- scheme for calculating incentive payments. We find it hard to believe that the parties intended for Neibert to receive incentive payments for work generally conducted by another division, much less that they wished for him to receive even larger payments than could employees of that division.

Neibert, however, leans on the fact that the clause expressly lists "Managed Hosting" as one of the available offerings, a phrase which appears several times in CSC's internal records regarding the Freddie Mac deal. This, however, is far too slender a reed to support his claims. For one thing, those documents also say, at the very top and in large bold print, "Freddie Mac- Mainframe Hosting" -- a type of service that, as we've explained, the Compensation Plan does not encompass. The record also indicates that Neibert himself created the Salesforce records, which were then ported over to Pulsepoint by a data entry clerk. After a transaction closed, CSC would typically undertake a more comprehensive review of the actual nature of the transaction to determine the credit due to each employee. We do not see how a two word designation on internal sales records could tie CSC's hands in any subsequent compensation review.

Under both Virginia law and Georgia law, CSC's reasonable interpretation of the scope of the Compensation Plan cannot give rise to an inference of bad faith. See Va. Vermiculite, Ltd., 108 F. Supp. 2d at 608 (requiring a showing of not only arbitrary, but intentionally dishonest conduct to establish bad faith under Virginia law); Korman, 660 S.E.2d at 44 (under Georgia law, "if there is room for construction, no bad faith can be inferred" (quotation omitted)). All in all, CSC reasonably concluded that the Freddie Mac mainframe transaction was categorically distinct from the cloud services contemplated by Neibert's Compensation Plan.

B.

Aside from the language of the Compensation Plan itself, Neibert's only other attempt to show bad faith rests on the declaration of Jay Myer, who served as his supervisor. Federal Rule of Civil Procedure 56(c)(4) stipulates that a declaration used to oppose a motion for summary judgment "must be made on personal knowledge, [and] set out facts that would be admissible in evidence." Applying this standard, the district court found Myer's declaration to be wholly insubstantial. We agree. Myer's three-page declaration makes, essentially, two points. First, Myer asserts that CSC's refusal to pay Neibert was unjustified. Second, Myer maintains that CSC had a practice of arbitrarily denying

commissions.  Neither of these bare assertions gives rise to a genuine dispute of material fact.

Myer's first allegation is entitled to no evidentiary weight.  He bluntly charges that CSC's decision was arbitrary, with no supporting factual detail.  We have "consistently held that conclusory allegations without specific supporting facts have no probative value."  Bowman, 713 F.3d at 1327 (quotation omitted).  Myer sheds no light on, for example, Neibert's role in the Freddie Mac negotiation, the nature of the transaction itself, the process by which CSC calculated Neibert's incentive payment, or any other relevant details.  Moreover, neither Myer's declaration nor any other record evidence suggests that Myer played any role in CSC's determination that the mainframe transaction fell outside of Neibert's compensation plan.

Myer's second allegation fares no better.  Myer draws the conclusion that CSC habitually denied commission payments in bad faith because of two such instances he observed.  Once again, he provides no factual background by which to assess these claims.  We don't know whether these decisions were made by the same personnel who evaluated Neibert's compensation, the full circumstances under which these other employees were denied payments, the terms of their compensation plans, nor even the names of the employees.  Nor does Myer explain how he learned about these incidents.  At best, Myer's threadbare declaration

18

provides only a "scintilla" of evidence to suggest that CSC acted in bad faith, which cannot preclude summary judgment.  See Young, 358 F.3d at 860.

Because there is no genuine dispute as to whether CSC acted in good faith, under Georgia law or Virginia law, we affirm the district court's grant of final summary judgment to CSC.

**AFFIRMED**.

FRIEDMAN, District Judge, concurs in the judgment only.