A03A1876. DEPARTMENT OF TRANSPORTATION v. HARDIN-SUNBELT, JOINT VENTURE.
(596 SE2d 397)

ANDREWS, Presiding Judge.

Following a jury trial and verdict[1] in favor of Hardin-Sunbelt, Joint Venture (Hardin) on its breach of contract claim against the Department of Transportation (DOT), DOT appeals, contending, on numerous grounds, that the trial court improperly denied its motion for directed verdict.

"Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence.

---

[11] *Saunders v. Vikers*, 116 Ga. App. 733, 736 (7) (158 SE2d 324) (1967).
[12] *Cotton v. Toole*, 183 Ga. App. 547, 548-549 (2) (359 SE2d 368) (1987).
[13] *Marques v. Ross*, 105 Ga. App. 133, 138-139 (123 SE2d 412) (1961).
[14] *Spencer v. Gary Howard Enterprises*, 256 Ga. App. 599, 601-602 (3) (568 SE2d 763) (2002), overruled on other grounds, *TGM Ashley Lakes, Inc. v. Jennings*, 264 Ga. App. 456, 462 (1) (590 SE2d 807) (2003).
[1] The jury awarded a total of $115,000, which included $88,835 claimed in actual damages and $26,165 in OCGA § 13-6-11 costs and attorney fees.

The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion for directed verdict, new trial and j.n.o.v. will not be disturbed." (Punctuation omitted.) *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 162 (1) (473 SE2d 256) (1996).

*Gantt v. Bennett*, 231 Ga. App. 238, 240 (1) (499 SE2d 75) (1998).

Viewed in favor of the jury's verdict, the evidence was that, by contract of October 25, 1995, DOT, as owner, contracted with Hardin as general contractor for construction of 1.283 miles of Sugarloaf Parkway in Gwinnett County, a $23 million project including construction of a portion of roadway, associated bridges, and an interchange. Incorporated into that contract was DOT's "Standard Specification-Construction of Roads and Bridges." Hardin then subcontracted with numerous subcontractors for portions of the project and all subcontracts also incorporated DOT's Standard Specification. On January 6, 1996, Hardin and Dinsmore Grading (Dinsmore) entered into a $4.5 million subcontract dealing with the project's earthwork. This earthwork included the restoration of a lake adjacent to the roadway construction. The lake, approximately two acres, was owned by Boeing Corporation (formerly Rockwell, Inc.) and was included in a temporary construction easement obtained by DOT. Although Section 166 of the Standard Specification provided that a lake such as the Boeing lake could be used as a sediment basin during the project, DOT wanted to keep the lake clear of siltation. By amendment to the specifications in October 1995, DOT provided, instead, that a sediment basin be created at the head of the lake by constructing a rock check dam to collect most sediment before it entered the lake. DOT had experience with another lake in the same area which had totally filled up while being used as a sediment basin and did not want this to happen to the Boeing lake. It was intended that most silt would be stopped by the dam and that which filtered through would be removed periodically from the lake from the top of the dam by Dinsmore.

The bid documents and contract list the sediment basin and lake restoration items as separate items, with the lake restoration item identified as "lump sum" and bid by Dinsmore at $88,835. As stated by Section 109.01 of the Standard Specification, "[t]he term 'Lump Sum' when used as an item of payment will mean complete payment for the Work described in the Contract."

Section 166.03.A of the Standard Specification regarding lake restoration provides that

> [a]fter the Roadway Work is completed to a point where the normal grass has produced a stand of sufficient density to prevent erosion and further pollution of the lake, *the Contractor shall excavate, and clean the lake of all foreign matter to its original contour and condition* or proposed contour, if different than the original. All material removed shall be disposed of in a manner satisfactory to the Engineer.

(Emphasis supplied.)

In order to determine the original contour of the lake, DOT conducted a survey of the lake by measuring its depth and contours before construction began. Following completion of the project, a second survey was conducted and it indicated that the lake contained more water after construction than before, indicating that material had been removed from the lake.

Kenneth Dinsmore, general superintendent for Dinsmore Grading on the Sugarloaf project, was on the job site daily and discussed the condition of the lake with Hawkins, his project foreman. He told Hawkins to keep the lake as clean as possible and wanted any silt to be removed by using the access they had, which was the rock check dam. Hawkins removed silt from the lake by using a backhoe on the rock check dam, removing 50 to 60 buckets per hour on at least several occasions. Hawkins cleaned silt from the lake and deposited the material into the sediment basin. Periodically, the sediment basin was emptied by loading the material into dump trucks and taking it to another area where it was spread and dried, to be dealt with later. The material was soupy and the trucks could not be fully loaded because it was like hauling water and when the trucks exited the lake area, it would run out the back of the truck.

Dinsmore had to build a dam around the area used to dry the silt and the drying frequently took weeks. Removing the silt from the sediment basin, including that which had previously been removed from the lake, trucking it out of the area, and drying it took as many as five pieces of heavy equipment and a half-dozen employees.

Although the contract provided that, upon completion of the project, the rock check dam and sediment basin would be removed, Boeing decided that it wanted the rock check dam left in place. As acknowledged by Graham, who was the State Construction Engineer for DOT during the Sugarloaf project, the contract provided that payment for the sediment basin item was made 75 percent upfront, with the remaining 25 percent due when the DOT advised Hardin that the sediment basin was no longer required and was to remain in

place or when the dam and sediment basin were removed, "whichever is applicable." It was not disputed that full payment was made by DOT for the sediment basin item.

Boeing required a lien waiver from Dinsmore and a release from Hardin of any obligation to pay for any work done on the sediment basin or lake restoration. The lien waiver was provided to Boeing May 13, 1999, and the release, signed by Hardin and Dinsmore, was provided in August. Boeing, in September 1999, also provided a release, which stated that Boeing released DOT, Hardin, and Dinsmore "from all liability of any nature, either present or consequential in connection with the restoration of Lake, Station 1050 + 00 Left, I-85." When Dinsmore began pursuing payment of the lump sum item for lake restoration, DOT made obtaining this release one of the items on its punch list. DOT received the release signed by Boeing on January 6, 2000.

By letter of January 25, 2000, DOT advised Hardin that

> [t]he Department has received the original signature release from Rockwell International/Boeing North American, Inc. However, we cannot remit payment for the Restoration of Lake line item. Rockwell/Boeing has apparently accepted the lake in its current state. According to Standard Specification 166.03.A, "the Contractor shall excavate, and clean the lake of all foreign matter to its original contour and condition." This restoration has not been performed.

Dinsmore, through Hardin, responded, stating its position that the lake restoration had been completed, the lake was restored to its original contour, and the lump sum payment was due. In response, on March 6, 2000, DOT again stated that no work was performed on the lake restoration and refused payment. The letter further stated that, "[s]ince they [Boeing] have now accepted that lake as is, you are directed to perform no further work within Rockwell Lake." In response, Hardin again demanded payment of the lump sum lake restoration item.

A meeting was held on June 5, 2000, with DOT, Hardin, and Dinsmore representatives present, to discuss the matter. At that meeting, DOT's expressed concern was to have someone who had actually witnessed work being done on the lake side of the rock check dam to vouch for it.[2] Dinsmore employees Dan Riggs and Kenneth Dinsmore orally advised DOT's engineer Caudell that they had been

---

[2] There is nothing in the Contract or Specification pointed to by DOT which requires such proof, other than the normal request for payment procedures.

present on occasions when the lake was cleaned of sediment.

Following this meeting, on June 5, 2000, Hardin again wrote DOT, requesting payment of the lake restoration item. On June 27, 2000, DOT responded, stating "there remains the issue of contemporaneous documentation of lake restoration performed on the Rockwell Lake." This letter again denied payment.

Because the lake restoration item was a lump sum item, it was not the practice in the industry or of either Hardin or Dinsmore to keep contemporaneous records of all the work done on it. Only when pay items were unit items, such as feet of pipe installed, would a contractor keep such records. On unit items, it was DOT's obligation to measure the units installed and compute payment amounts. Even Caudell, DOT's construction engineer, acknowledged that lump sum items are generally not quantified.

Nonetheless, Dinsmore found an entry in the job diary of Joe Hawkins, its job foreman, which stated that on May 2, 1996, Dinsmore had "hauled out silt from pond by Rockwell 'till about 2:30 [p.m.]" This was forwarded to DOT by Hardin, but payment was still denied.

1. DOT's first two enumerations argue that denial of its motion for directed verdict based on Section 105.13 was error. They are considered together.

That section, titled "CLAIMS FOR ADJUSTMENTS AND DISPUTES," provides that, "[w]henever the Contractor believes that it is or will be entitled to *additional compensation*, whether due to delay, extra work, breach of contract, or other causes, the Contractor shall follow the procedures set forth in this Sub-Section." (Emphasis supplied.)

Those procedures include, among other things, a detailed factual statement of the basis for the claim, providing dates, locations, and items of work affected by the claim; the dates on which actions resulting in the claim occurred; the names, functions, and activities of each contractor or subcontractor involved in the facts giving rise to the claim; and the amount of additional compensation sought and a breakdown of that amount into specified categories.

Graham, DOT's State Construction Engineer and the only witness called by DOT, acknowledged that neither delay nor acceleration was involved in this matter, but contended that this was covered by "other claims." He also acknowledged, however, that the Section 105.13 subsection dealing with other claims also referred to cases where the contractor "believes that it will be entitled to *additional compensation* for reasons other than delay or acceleration." (Emphasis supplied.)

Both Hardin and Dinsmore disputed that any additional compensation was being sought, only payment of a lump sum item which had been performed by Dinsmore.

Hardin filed its motion for summary judgment below based on the language of the contract, contending that the lake restoration had been completed and payment was due. DOT's cross-motion for summary judgment asked the trial court to find that the required lake restoration had not been performed. The trial court denied both, stating as a reason only that disputed issues of fact remained. The trial court also declined to issue a certificate of immediate review, as requested by Hardin.

The construction of a contract is a question of law for the court. OCGA § 13-2-1.

> The cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement. [Cit.] Construction of a contract by the court involves three steps. [Cit.] First, if no ambiguity appears, the trial court enforces the contract according to its terms irrespective of all technical or arbitrary rules of construction. . . . Secondly, if ambiguity does appear, the existence or nonexistence of an ambiguity is a question of law for the court. Finally, a jury question arises *only* when there appears to be an ambiguity in the contract which cannot be negated by the court's application of the statutory rules of construction. [Cit.]

(Punctuation omitted; emphasis supplied.) *Atlanta Development v. Emerald Capital Investments*, 258 Ga. App. 472, 477 (1) (574 SE2d 585) (2002).

It is unclear here whether the trial court found an ambiguity in the contract provisions or merely a factual question as to whether any lake restoration work had been done. Examining the contract, we find no ambiguity regarding Section 105.13. "Additional" can only be reasonably read to mean a claim by the contractor for compensation not already provided for by the contract terms. The lump sum payment for lake restoration was provided for by the contract terms. DOT argued below that, while some sediment may have been removed from the lake, one could not tell this by looking at the lake when the project was finished and that the work performed was not substantial enough to justify payment of the total lump sum. These prerequisites for payment, however, are nowhere found in the contract. Even Graham, DOT's sole witness, acknowledged that it did not matter how much silt was removed from the lake, as long as the lake was returned to its original condition.

Even if construction of Section 105.13 is doubtful, any ambiguity must be resolved in favor of the nondrafting party, here Hardin and its subcontractor Dinsmore. *Kennedy v. Brand Banking Co.*, 245 Ga. 496, 500 (2) (266 SE2d 154) (1980). Thus, even assuming that Section 105.13 is ambiguous, the ambiguity must be construed most strongly against DOT which drafted the contract. *Sheridan v. Crown Capital Corp.*, 251 Ga. App. 314, 316 (1) (554 SE2d 296) (2001); *Baker Mtg. Corp. v. Hugenberg*, 145 Ga. App. 528, 529 (1) (244 SE2d 56) (1978).

Finally, the jury was instructed regarding contract interpretation and found against the construction of Section 105.13 argued below and here by DOT. There was no error in the trial court's denial of DOT's motion for directed verdict on this ground. See *Caswell v. Anderson*, 241 Ga. App. 703, 706 (527 SE2d 582) (2000); *Salvatori Corp. v. Rubin*, 159 Ga. App. 369, 372 (1) (283 SE2d 326) (1981).

2. DOT argues, in enumerations 3 and 4, that the lake restoration item was eliminated from the contract by DOT as provided in Section 109.06, relying on its March 6, 2000 letter to Hardin directing it to "perform no further work within Rockwell Lake." These enumerations are considered together.

Section 109.06 provides that

[s]hould any Items contained in the Proposal be found unnecessary for the proper completion of The Work, the Engineer may, upon written order to the Contractor, eliminate such Items from the Contract, and such action shall in no way invalidate the Contract. When a Contractor is notified of the elimination of Items, he will be reimbursed for actual work done and all costs incurred, including mobilization of materials prior to said notifications.

As acknowledged by Dinsmore and DOT's Graham, nothing was ever done by DOT to eliminate this item except the March 6, 2000 letter, which came long after the lake restoration work had been done by Dinsmore. Also, Graham testified, somewhat in contradiction of this position, that the lake restoration item was "not complete."

There was no error in denying DOT's motion for directed verdict for this reason, as well as the reasons set out in Division 1.

3. Enumeration 5 asserts error in the trial court's denying DOT's motion for directed verdict based on Section 109.08.

Section 109.08 of the Specification deals with the final statement of quantities of various classes of work performed on the project, which, on its face, would apply only to classes of work which were to be paid by quantities, not lump sum items such as lake restoration. See Division 1.

We note that DOT's positions with regard to failure to give proper notice of a claim under Section 105.13 and that the claim is not yet ripe because final quantities have not been completed are inconsistent.

Any question of the applicability of Section 109.08 to the lake restoration item was determined adversely to DOT and there was evidence to support the jury's conclusion.

There was no error in denying the motion for directed verdict on this ground.

4. Enumerations 6 and 7 are that the trial court erred in denying DOT's motion for directed verdict on attorney fees because Section 105.13 dealing with claims precludes recovery for attorney fees and there was no evidence to support an award under OCGA § 13-6-11.

As noted in Division 1, Section 105.13 does not apply to this situation.

OCGA § 13-6-11 permits the jury to award attorney fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." If a bona fide controversy exists, the plaintiff may recover attorney fees under this Code section only if the defendant has acted in bad faith in the underlying transaction. *Latham v. Faulk*, 265 Ga. 107, 108 (2) (454 SE2d 136) (1995). Issues regarding the existence of a bona fide controversy or a defendant's bad faith are generally for the jury to decide. *Southern Co. v. Hamburg*, 220 Ga. App. 834, 841 (4) (470 SE2d 467) (1996); *Toncee, Inc. v. Thomas*, 219 Ga. App. 539, 542 (3) (466 SE2d 27) (1995). Finally, an award of attorney fees under OCGA § 13-6-11 should be affirmed if there is any evidence to support it. *Toncee*, supra.

In contract actions like this one, the element of bad faith relates to the defendant's conduct in entering into the contract or pertains to the transaction and dealings out of which the cause of action arose, not to the defendant's conduct after the cause of action arose. *Kemira, Inc. v. Williams Investigative &c. Svcs.*, 215 Ga. App. 194, 200 (3) (450 SE2d 427) (1994).

As set out above, there was evidence from which the jury could conclude that DOT's actions regarding the lake restoration item were in bad faith, that DOT was stubbornly litigious, and that DOT caused Hardin unnecessary trouble and expense. *Gateway Bank & Trust v. Timms*, 259 Ga. App. 299, 302 (4) (577 SE2d 15) (2003); *Driggers v. Campbell*, 247 Ga. App. 300, 304 (4) (543 SE2d 787) (2000).

There was no error in denying DOT's motion for directed verdict on this issue. The trial court is directed to issue a judgment consistent with this opinion in favor of Hardin upon receipt of the remittitur.

*Judgment affirmed. Barnes and Adams, JJ., concur.*

DECIDED FEBRUARY 11, 2004 —
RECONSIDERATION DENIED MARCH 8, 2004 — 

*Thurbert E. Baker, Attorney General, Daniel M. Formby, Deputy Attorney General, George C. Reid, Matthew E. Cline,* for appellant. *Stockton & Stockton, Lawrence A. Stockton, Jr.,* for appellee.