A09A2045. CAPITAL HEALTH MANAGEMENT GROUP, INC.
v. HARTLEY.
(689 SE2d 107)

BERNES, Judge.
Deborah Moss Hartley brought this action for breach of contract against her former employer, Capital Health Management Group, Inc., alleging that she was wrongfully denied payment of certain stock appreciation rights under a deferred compensation agreement

entered into as part of her employment.[1] The trial court concluded that the agreement gave Capital Health discretionary decision-making authority, but that a genuine issue of material fact existed over whether the decision to deny payment to Hartley was made in good faith and involved the exercise of honest judgment. The case proceeded to trial, the jury returned a verdict in favor of Hartley, and Hartley was awarded breach of contract damages, prejudgment interest, and attorney fees and expenses under OCGA § 13-6-11. Following the denial of its motion for judgment notwithstanding the verdict (j.n.o.v.) or for a new trial, Capital Health appeals, contending that (1) the issue of whether it abused its discretionary decision-making authority was a legal question for the trial court to resolve rather than a factual question for the jury; (2) the trial court should have found as a matter of law that Capital Health's decision to deny payment to Hartley was made in good faith and involved the exercise of honest judgment; (3) the trial court erred in admitting testimony concerning a telephone conversation between Hartley and the president of Capital Health that occurred after her termination; and (4) there was insufficient evidence of bad faith to support an attorney fee award under OCGA § 13-6-11. For the reasons discussed below, we affirm.[2]

Following a jury trial, we construe the evidence in the light most favorable to the verdict. *Dept. of Transp. v. Hardin-Sunbelt*, 266 Ga. App. 139, 140 (596 SE2d 397) (2004). So viewed, the evidence showed that Capital Health was a private corporation that provided management services to home healthcare agencies, principally in the southeast United States. In December 1997, Capital Health hired Hartley as a regional director of operations. Two years later, she was promoted to the position of regional vice president of operations. During her tenure at Capital Health, Hartley consistently received good performance reviews.

*The Stock Appreciation Rights Agreement.* As part of her employment with Capital Health, Hartley entered into a "Stock Appreciation Rights Agreement" (the "Agreement"). The Agreement stated that its purpose was "to provide [Hartley] with an incentive to promote the growth and profitability of [Capital Health] using deferred compensation." In order to create such an incentive, the Agreement provided that Hartley was to be paid the value of 60,000 shares of Capital Health stock upon the sale of all or substantially all of the common stock owned by Capital Health, if she was still

---

[1] At the time of her employment, the plaintiff was known as Deborah Moss or Deborah Moss-Smith. For clarity, she will be referred to as "Hartley" throughout this opinion.

[2] Hartley's motion for damages for frivolous appeal under OCGA § 5-6-6 is denied.

employed by Capital Health at the time of the sale, or if she had been terminated "as a result of" death, retirement, or disability.

There also were provisions addressing the administration of the Agreement. The Agreement provided:

> This Agreement shall be administered by the Compensation Committee of the Board of Directors of [Capital Health] or, if there is no Compensation Committee, by the Board of Directors (as the case may be, the "Committee"). The Committee shall have the authority to interpret this Agreement and to adopt and revise such policies, rules and regulations that it determines in its sole discretion, to be necessary or advisable for the administration of this Agreement. Determinations by the Committee shall be made by majority vote and shall be final and binding on all parties with respect to all matters relating to this Agreement.[3]

The Agreement further specified that "disability" for purposes of termination would be "determined in the sole discretion of the Committee."

In addition, the "Miscellaneous Provisions" of the Agreement stated that

> [t]he Agreement shall at all times be entirely unfunded, and [Capital Health] shall have no obligation to segregate any assets . . . for payment of any benefits hereunder. [Hartley] shall not have any interest in any particular assets of [Capital Health] by reason of the right to receive a benefit under this Agreement and shall have only the rights of a general unsecured creditor of [Capital Health] with respect to any rights under the Agreement.

Finally, the Agreement specified that it should be construed and governed by Georgia law.

*Hartley's Medical Condition and Termination.* In June 2000, Hartley began experiencing severe fatigue and headaches that made it difficult for her to work. She was diagnosed with fibromyalgia and informed Capital Health of her diagnosis.[4] Her medical condition continued to deteriorate, and beginning in the fall of 2000, she was

---

[3] There is no evidence in the record that a compensation committee was ever created for the administration of the Agreement.

[4] Fibromyalgia is "a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/fibromyalgia.

unable to continue performing her job responsibilities. From September 2000 through November 2000, Hartley was absent from her employment due to her health and took eight of the twelve weeks of medical leave allowed to her under the Family Medical Leave Act of 1993, 29 USC § 2601 et seq. ("FMLA"). In order to obtain leave authorized by the FMLA, Hartley submitted a physician's certification stating that she had been diagnosed with fibromyalgia of "indefinite" duration. Hartley also applied for and received benefits under Capital Health's short-term disability policy during this eight-week period. While on medical leave, Hartley kept Capital Health fully apprised of her medical condition.

Hartley returned to work briefly in late November 2000, but by January 2001, she was unable to carry out her job responsibilities because of her medical condition. Hartley again received short-term disability benefits and took medical leave under the FMLA after submitting a new physician's certification. Hartley gave Capital Health weekly updates about her medical condition during this period of time.

Hartley ultimately informed personnel from Capital Health's human resources department in January 2001 that she would not be able to return to work due to her fibromyalgia. They advised her to apply for long-term disability benefits and assisted her in the application process. At the same time, however, Hartley was informed in a telephone conversation with the human resources department that her FMLA medical leave was set to expire on February 1, 2001, and that Capital Health would not offer her any additional medical leave beyond what was allowed to her under federal law.

On January 29, 2001, Capital Health received a new physician's FMLA certification stating that the duration of Hartley's fibromyalgia was "unknown: 3 years." After receiving the new physician's certification, human resources personnel from Capital Health called Hartley later that day, advised her that Capital Health had received the certification, and informed her that she would be receiving a termination letter. Hartley testified that she was told at that time "that I was going to be terminated due to my disability."

Shortly thereafter, Hartley received a termination letter. The letter confirmed that Hartley would be terminated if she did not return to work when her FMLA medical leave expired on February 1, 2001. Capital Health thanked Hartley for her contributions to the company and "wish[ed] [her] improved health in the future."

When Hartley did not return to work on February 1, 2001, she was terminated from her position of regional vice president of operations. Business records introduced at trial reflected that Capital Health told its disability insurer that Hartley had been terminated "given her end of FMLA leave and the dr. cert."

*The Sale of Capital Health's Common Stock.* In June 2005, all of the common stock of Capital Health was sold to another company. Capital Health did not notify Hartley of the sale, and Hartley was not paid the value of 60,000 shares of Capital Health stock upon the sale of the common stock. The value of the stock at the time of the sale was $343,861.

When the stock sale occurred, Capital Health had three shareholders. Any money from the stock sale not paid to Capital Health employees in stock appreciation rights was to be paid to the three shareholders. At least one of the shareholders, who also served as the president and chief executive officer ("CEO") of Capital Health, approved the recommendation to terminate Hartley and was actively involved in the board of director's decision to deny her payment of her stock appreciation rights.

*The Litigation.* After learning of the stock sale, Hartley commenced this breach of contract action against Capital Health, alleging that she was entitled to payment of her stock appreciation rights under the Agreement because she had been terminated as a result of disability. Hartley also sought attorney fees and expenses under OCGA § 13-6-11 because Capital Health allegedly had acted in bad faith, had been stubbornly litigious, and had caused her unnecessary trouble and expense.

Capital Health answered and, following discovery, moved for summary judgment on the ground that Hartley was not terminated as a result of a disability as a matter of law. Capital Health asserted that Hartley had been terminated as the result of a corporate reorganization rather than as result of a disability. Concluding that genuine issues of material fact remained, the trial court denied the motion.

Capital Health later moved for partial summary judgment on the issue of whether the Agreement gave it discretionary decision-making authority. According to Capital Health, its decision to deny Hartley payment under the Agreement had to be upheld so long as the decision was made in good faith and involved the exercise of honest judgment. Capital Health further argued that this was a legal question that should be decided in its favor by the trial court. In subsequently granting partial summary judgment to Capital Health, the trial court concluded that the Agreement gave Capital Health discretionary decision-making authority, but that a genuine issue of material fact existed for jury resolution over whether Capital Health's decision to deny payment to Hartley was made in good faith and involved the exercise of honest judgment.

A jury trial ensued, during which Capital Health unsuccessfully moved for a directed verdict on Hartley's claims. After hearing all of the evidence, the jury returned a special verdict form in which it found that Capital Health's decision declining to award Hartley her

stock appreciation rights under the Agreement was not made in good faith or with honest judgment. The jury further found that Hartley was entitled to attorney fees and expenses because Capital Health had acted in bad faith. Judgment was entered in favor of Hartley awarding her breach of contract damages, prejudgment interest, and attorney fees and expenses under OCGA § 13-6-11. Capital Health moved for j.n.o.v. or for a new trial, which the trial court denied, resulting in this appeal.

1. Capital Health argues that the issue of whether it abused its discretionary decision-making authority was a legal question for the trial court to decide rather than a factual question for jury resolution. We disagree.

Hartley does not dispute that Capital Health was granted discretionary decision-making authority under the Agreement. Hence, the "sole question" in considering Hartley's breach of contract claim was whether Capital Health's decision not to award Hartley benefits under the Agreement "was made in good faith and involved the exercise of honest judgment." *Planning Technologies v. Korman*, 290 Ga. App. 715, 718 (660 SE2d 39) (2008).[5] See also *ULQ v. Meder*, 293 Ga. App. 176, 179-180 (1) (666 SE2d 713) (2008). The concept of good faith encompasses basic notions of "fairness and commercial reasonableness." (Citations, punctuation and footnotes omitted.) *Hunting Aircraft v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 452 (1) (636 SE2d 139) (2006). "[A] decision was not made in good faith if it was made for arbitrary or capricious reasons, was based on an improper pecuniary motive, or was predicated on dishonesty or illegality." (Citations omitted.) *Planning Technologies*, 290 Ga. App. at 720. Furthermore, "a decision can be so grossly erroneous, as where there is a total absence of any factual evidence to support it, that it creates an inference of bad faith and dishonest judgment." Id. See also *Sacks v. Bell Telephone Laboratories*, 149 Ga. App. 799, 803 (3) (256 SE2d 87) (1979) (noting that "bad faith may . . . be inferred from an adverse decision which has no basis in fact"). The requirement that a party exercise good faith and honest judgment, even where the contractual language grants the party discretion, arises from the implied duty of good faith and fair dealing imposed upon virtually every contract under Georgia law. See *ULQ*, 293 Ga. App. at 179 (1); *Hunting Aircraft*, 281 Ga. App. at 451-452 (1).

Significantly, we have held in several cases that whether a party exercised good faith and honest judgment in the performance of a

---

[5] Capital Health concedes that the Agreement did not give it absolute and uncontrolled discretion. See *Planning Technologies*, 290 Ga. App. at 718-720. Compare *Charles v. Leavitt*, 264 Ga. 160 (442 SE2d 241) (1994); *Knight Indus. v. Turner Marketing*, 157 Ga. App. 177, 178-179 (276 SE2d 860) (1981).

contract is a factual question for the jury to resolve. See *Camp v. Peetluk*, 262 Ga. App. 345, 350 (2) (585 SE2d 704) (2003); *Rogers v. Farmers & Merchants Bank*, 247 Ga. App. 631, 633 (545 SE2d 51) (2001); *Ginn v. C & S Nat. Bank*, 145 Ga. App. 175, 177 (1) (243 SE2d 528) (1978); *MacDougald Constr. Co. v. State Highway Dept.*, 125 Ga. App. 591, 594 (1) (188 SE2d 405) (1972). See also *Hunting Aircraft*, 281 Ga. App. at 452 (1) ("What constitutes good faith is a question for the finder of fact.") (citation omitted). Indeed, in a recent case involving discretionary authority to terminate an executive officer under a business operating agreement, we upheld the denial of summary judgment to the defendant, pointing out that *"[a] jury would be authorized to find"* that the termination of the officer was made "for the purpose of indirect personal pecuniary gain" and thus was not made in good faith. (Emphasis supplied.) *ULQ*, 293 Ga. App. at 180 (1). Given this clear line of precedent, the trial court correctly concluded that it was for the jury to resolve whether Capital Health's decision not to award Hartley benefits under the Agreement was made in good faith and with honest judgment.

In arguing for a contrary result, Capital Health relies upon federal cases addressing employee benefit plans regulated under the Employee Retirement Income Security Act of 1974, 29 USC § 1001 et seq. ("ERISA"), which hold that a judge rather than a jury should review the discretionary decisions of a plan administrator. See, e.g., *Berry v. Ciba-Geigy Corp.*, 761 F2d 1003, 1006-1007 (II) (4th Cir. 1985); *Carder-Cowin v. UNUM Life Ins. Co. of America*, 560 FSupp.2d 1006, 1016 (II) (3) (W.D. Wash. 2008). But the present case does not involve an employee benefit plan under ERISA, and Capital Health does not contend otherwise. See, e.g., *Murphy v. Inexco Oil Co.*, 611 F2d 570, 574-576 (III) (5th Cir. 1980); *Teague v. Southern Elevator Group*, No. 1:02CV00829, 2003 U. S. Dist. LEXIS 10291, *7-12 (M.D. N.C. Jan. 23, 2003); *Hahn v. Nat. Westminister Bank*, 99 FSupp.2d 275, 279-281 (II) (E.D. N.Y. 2000); *Intl. Paper Co. v. Suwyn*, 978 FSupp. 506, 510-512 (A) (S.D. N.Y. 1997). Hence, the cases cited by Capital Health are inapposite.

Capital Health also argues more generally that under the common law of trusts, judicial proceedings to review the discretionary administration of employee benefits should be treated as equitable in nature and thus as a matter for a judge rather than a jury to resolve. As an initial matter, Capital Health did not raise this trust-related argument in the court below. "Since this [C]ourt will not consider arguments neither raised nor ruled on in the trial court and that are asserted for the first time on appeal, [Capital Health's] argument is waived." (Punctuation and footnote omitted.) *Morris v. Johnson*, 262 Ga. App. 182, 185 (585 SE2d 375) (2003).

In any event, Capital Health's argument is flawed because the

present case does not involve the administration of a trust. "A contract to convey property is not a trust, whether or not the contract is specifically enforceable." Restatement (Second) of Trusts, § 13 (1959). "One of the major distinctions between trust and contract is that in a trust, there is always a divided ownership of property, the trustee having usually a legal title and the beneficiary an equitable one, whereas in contract, this element of division of property interest is entirely lacking." (Footnotes omitted.) 76 Am. Jur. 2d Trusts § 12 (2008). The creation of a trust, moreover, requires a transfer of identifiable property to be held for the benefit of some other party. See *Wolfe v. C & S Nat. Bank*, 221 Ga. 412, 415 (144 SE2d 735) (1965); *Smith v. Hawks*, 182 Ga. App. 379, 381 (1) (355 SE2d 669) (1987). See also 1 Mary F. Radford, Redfearn Wills and Administration in Ga., § 14:3, p. 622 (7th ed. 2008).

The terms of the Agreement make clear that it was nothing more than a contract for deferred compensation. No assets of Capital Health were segregated out under the Agreement for the benefit of Hartley, and Hartley was not given title to or "any interest in any particular assets of [Capital Health] by reason of the right to receive a benefit under [the] Agreement." Rather, Capital Health simply agreed to provide Hartley with incentive compensation using a designated formula, contingent upon the happening of a specified future event. Under these circumstances, it is clear that Hartley's claim was for a breach of contract and was appropriate for jury resolution. See generally *Columbus Clinic v. Liss*, 252 Ga. App. 559 (556 SE2d 215) (2001) (issue of whether company breached employment agreement by terminating employee and not compensating him in accordance with the agreement was for the jury to resolve).

2. Capital Health next contends that the trial court erred in denying its motion for summary judgment, for directed verdict, for j.n.o.v., and for a new trial because the uncontroverted evidence of record showed that its decision not to award Hartley benefits under the Agreement was made in good faith and involved the exercise of honest judgment. According to Capital Health, the evidence established as a matter of law that it made the decision not to award Hartley her stock appreciation rights based on a good faith belief that Hartley had been terminated as the result of a corporate reorganization rather than as a result of her disability. Again, we disagree.

> Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every

> inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict.

(Citations and punctuation omitted.) *Hardin-Sunbelt*, 266 Ga. App. at 139-140. If there was any evidence to support an inference that Capital Health was not acting in good faith or with honest judgment, the issue was properly left to the jury. See *Sacks*, 149 Ga. App. at 803 (3). Guided by these principles, we conclude that the issue of good faith was properly left for jury resolution. There was evidence upon which the jury could find that Capital Health knew Hartley was disabled and terminated her as the result of her disability, but later denied her payment under the Agreement on a basis lacking factual support in the record and out of an improper pecuniary motive.

(a) The jury was entitled to find that Capital Health knew Hartley was disabled and terminated her as the result of her disability. It was undisputed at trial that Hartley suffered from fibromyalgia. Hartley testified that she kept Capital Health fully abreast of her medical condition, diagnosis, and treatment; exhausted 12 weeks of medical leave as the result of her deteriorating medical condition; ultimately informed Capital Health that she was unable to return to work due to her fibromyalgia; and asked for and received assistance from Capital Health in applying for long-term disability benefits. Furthermore, Hartley testified that she was specifically told by Capital Health "that [she] was going to be terminated due to [her] disability." The termination letter received by Hartley, moreover, expressly referenced her health and stated that she was being terminated because she had exhausted all of her authorized FMLA medical leave. Finally, business records introduced at trial reflected that Capital Health informed its disability insurer that Hartley had been terminated because her medical leave had been exhausted and because of her doctor's FMLA certification indicating that her disability was anticipated to be of extended duration. This combined evidence introduced at trial on the issue of Hartley's disability, and her termination as a result of that disability, clearly was sufficient to meet the "any evidence" standard.

Capital Health argues that Hartley should have been required to establish that she was terminated as a result of her disability under the test for recovery utilized by federal courts in cases brought pursuant to the Americans with Disabilities Act of 1990, 42 USC § 12101 et seq., and the Rehabilitation Act of 1973, 29 USC § 701 et seq. We decline, however, to incorporate this complex and difficult body of federal law into a common law breach of contract claim.

Capital Health also argues that Hartley was not terminated as the result of her disability but rather for the "neutral" reason that

her FMLA medical leave had expired. This argument is without merit. Construed in favor of the jury verdict, the evidence showed that Hartley was terminated at the end of her FMLA medical leave for the very reason that she remained disabled and was unable to return to work as a result of her disability.

(b) The jury likewise was entitled to find that Capital Health denied payment to Hartley under the Agreement on a basis lacking factual support in the record and out of an improper pecuniary motive. It is true that Todd Wiebusch — the president and CEO of Capital Health who approved the recommendation to terminate Hartley and was actively involved in the board of director's decision to deny Hartley her stock appreciation rights — testified that Capital Health declined to pay Hartley under the Agreement after concluding that she had been terminated as a result of a corporate reorganization. According to Wiebusch, the federal government changed the manner in which home healthcare providers were compensated for their services in 2000, which required Capital Health to become more "cost conscious" and to reorganize its operations. Wiebusch testified that as a result of the corporate reorganization, Hartley's primary job responsibilities were reassigned to other executive officers, rendering her position of regional vice president of operations no longer cost effective or necessary. Wiebusch further testified that he gave final approval to Hartley's termination and that he made that decision as a result of the organizational changes.[6]

Capital Health, however, failed to produce any human resources documents or other business records supporting Wiebusch's position that Hartley was terminated as a result of the corporate reorganization. Moreover, on cross-examination, Wiebusch conceded that a new Capital Health organization chart created in response to the changes mandated by the federal government continued to show Hartley's executive position as being part of the corporate structure. Wiebusch further conceded that the board of directors of Capital Health made no investigation or inquiry into the disability issue before deciding whether to deny payment to Hartley under the Agreement. Additionally, Hartley presented documentary evidence on cross-examination reflecting that Wiebusch had a pecuniary interest in Hartley not receiving payment under the Agreement, as any money not paid to employees in stock appreciation rights was to be paid to Capital

---

[6] Capital Health claims that "Hartley conceded that the basis for [Capital Health's] decision was reasonable" and "readily acknowledged that the reasons for termination given by Wiebusch were 'sound.' " While Hartley agreed on cross-examination that "sound" grounds for a *hypothetical* employer to terminate an employee could include a corporate reorganization or cost-cutting measures, she in no way conceded that those grounds had anything to do with her termination in this case.

Health's three shareholders, one of whom was Wiebusch.

Given Hartley's impeachment of Wiebusch and the absence of any documentary evidence to support his version of events, the jury was authorized to find that Capital Health's claim that Hartley was terminated as a result of the corporate restructuring was unsupported by any factual basis and was motivated by an improper pecuniary motive. The jury's finding in this regard was buttressed by Hartley's testimony concerning a telephone conversation that she had with Wiebusch following her termination, a conversation that could be construed as showing that Capital Health did not take the position that Hartley had been terminated due to a corporate reorganization until many years after her termination had occurred.

Specifically, Hartley testified that in January 2004, she had a telephone conversation with Wiebusch in which he told her that she no longer had any right to payment under the Agreement in the event of a stock sale, since Capital Health's long-term disability insurer had not awarded her benefits as of the time of her termination. Hartley testified that she then corrected Wiebusch and informed him that she had been awarded long-term disability benefits retroactive to September 2000, long before she had been terminated. According to Hartley, at no point during their conversation did Wiebusch mention the corporate restructuring as a basis for her termination.

The telephone conversation related by Hartley tended to prove that Capital Health did not claim that she was terminated due to a reorganization until some time after January 2004, many years after her termination. The conversation also tended to prove that the reorganization claim arose only after Wiebusch had learned from Hartley that his initial stated reason for why she should not receive payment under the Agreement was incorrect. The conversation thus would support a finding by the jury that the reorganization claim was a post hoc rationalization invented for the purpose of precluding Hartley from receiving payment under the Agreement.

For the combined reasons set forth in subsections (a) and (b) of this division, there was evidence that Capital Health's decision to deny payment to Hartley under the Agreement was not made in good faith and did not involve the exercise of honest judgment. See *Planning Technologies*, 290 Ga. App. at 720 (bad faith can be inferred where the defendant's decision lacked any factual evidence to support it or was motivated by an improper pecuniary motive); *Sacks*, 149 Ga. App. at 803 (3) (bad faith inferred where the defendant's decision "ha[d] no basis in fact"). The trial court did not err in denying Capital Health's motions for summary judgment, for directed verdict, for j.n.o.v., and for a new trial.

3. Capital Health maintains that the trial court erred in admit-

ting Hartley's testimony concerning her telephone conversation with Wiebusch in January 2004. Capital Health asserts that the conversation was irrelevant and highly prejudicial. We are unpersuaded.

> Unless the potential for prejudice in the admission of evidence substantially outweighs its probative value[,] the Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value. Evidence of doubtful relevancy or competency should be admitted and its weight left to the jurors. Where evidence is offered and objected to, if it is competent for any purpose, it is not erroneous to admit it. Absent a manifest abuse of discretion, a court's refusal to admit evidence on grounds of lack of relevance will not be disturbed on appeal.

(Citations and punctuation omitted.) *Wilson v. Southern R. Co.*, 208 Ga. App. 598, 604 (4) (431 SE2d 383) (1993).

We find no manifest abuse of discretion in this case. As made clear in Division 2 (b), Hartley's testimony concerning the telephone conversation was relevant to discredit Capital Health's claim that its decision to deny Hartley payment under the Agreement was based on a good faith belief that she had been terminated as the result of a corporate reorganization. The trial court, therefore, committed no error in admitting the testimony. See *Wilson*, 208 Ga. App. at 604 (4).

4. Lastly, Capital Health argues there was insufficient evidence of bad faith to support the award of attorney fees and expenses under OCGA § 13-6-11. We do not agree.

OCGA § 13-6-11 provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

Bad faith for purposes of the statute means bad faith during the transaction out of which the lawsuit arose. See *Merlino v. City of Atlanta*, 283 Ga. 186, 191 (4) (657 SE2d 859) (2008). "Questions as to whether the defendant has acted in bad faith are generally for the jury to decide." (Citation omitted.) Id. An award of attorney fees under OCGA § 13-6-11 should be affirmed if there is any evidence to support it. See *ISS Intl. Svc. Systems v. Widmer*, 264 Ga. App. 55, 62 (4) (589 SE2d 820) (2003).

The same evidence discussed in Division 2 (a) and (b) was

sufficient to authorize the jury to find that Capital Health acted in bad faith in denying payment to Hartley under the Agreement. Accordingly, the award of attorney fees and expenses was proper. See, e.g., *ISS Intl. Svc. Systems*, 264 Ga. App. at 62-63 (4) (finding of bad faith supported by evidence that defendant terminated senior executive and ignored clear terms of employment agreement simply to avoid having to pay the executive); *Bryan v. Brown Childs Realty Co.*, 252 Ga. App. 502, 507-508 (3) (556 SE2d 554) (2001) (finding of bad faith supported by evidence that defendant repudiated the compensation agreement because the terms of the agreement had proven disadvantageous to him).

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED DECEMBER 30, 2009.

*Heyman & Sizemore, William B. Brown*, for appellant.

*Doffermyre, Shields, Canfield, Knowles & Devine, Sheryl L. McCalla, David S. Hagy*, for appellee.